GENE HAMON FORD, INC., d/b/a Hamon Nissan; and the Motor Vehicle Board of the Texas Department of Transportation, Appellants,

v.

DAVID McDAVID NISSAN, INC., Appellee.

No. 03–98–00459–CV.

Court of Appeals of Texas, Austin.

June 30, 1999.

Rehearing Overruled Aug. 26, 1999.

William David Coffey, III, Wm. David Coffey, III, Linda B. Secord, Assistant Attorney General, Austin, for Appellant.

J. Bruce Bennett, Baskin, Bennett & Komkov, L.L.P., William R. Crocker, Austin, for Appellee.

Before Justices JONES, B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

Appellant Gene Hamon Ford, Inc., d/b/a Hamon Nissan ("Hamon") is a Nissan dealership located in Texas City. Hamon applied to the Motor Vehicle Board of the Texas Department of Transportation (the

"Board") for permission to relocate on the Gulf Freeway in League City, closer to the southeast Houston area. Appellee David McDavid Nissan, Inc. ("McDavid"), a Nissan dealer located on the Gulf Freeway southeast of Houston, protested Hamon's application. After a hearing, the administrative law judge ("ALJ") issued a proposal for decision ("PFD") recommending approval of Hamon's relocation application and denial of McDavid's protest. The Board unanimously adopted the ALJ's opinion, findings of fact, and conclusions of law.

McDavid sought judicial review of the Board's order in district court pursuant to the Administrative Procedure Act ("APA"), Tex. Gov't Code Ann. § 2001 (West 1999). *See* Tex. Motor Vehicle Commission Code ("TMVC Code")[1] § 7.01(a) (West Supp.1999). The Board's order is reviewed under the substantial evidence standard of review. *See* Tex. Gov't Code Ann. § 2001.174. One of McDavid's arguments before the district court was that section 4.02(a) of the TMVC Code required Hamon to prove its economic viability in the League City location, and that the Board erred by failing to require such proof. The district court reversed the Board's decision; Hamon and the Board now appeal the district court's judgment. We will reverse and render judgment upholding the Board's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

Because our analysis involves a substantial evidence review, a summary of the facts is necessary. Hamon has sold Nissans since 1985 in Texas City, a town located on the mainland northwest of Galveston and southeast of Houston. The economies of many communities southeast of Houston are based on the petrochemical industry. Indeed, the historically oil-dependent nature of Houston's economy

1. The TMVC Code is found at article 4413 of the Revised Civil Statutes. Tex.Rev.Civ. Stat. Ann. art. 4413(36) (West Supp.1999). For convenience and clarity, we will cite the TMVC Code, not article 4413.

caused it to suffer a recession during the mid–1980s; however, since then Houston's economy has diversified greatly, branching into such areas as applied technology and medicine. As a result, Houston has grown rapidly in the 1990s. In contrast, Texas City remains primarily tied to the petrochemical industry, and its economy and population have generally declined over the past decade.

In 1995, Hamon applied to the Board for permission to relocate its dealership on the Gulf Freeway[2] in League City, about three miles from Clear Lake. The proposed move would place Hamon along the southern border of the Houston metro area, a market for new car sales that has been growing steadily since 1992. The move would also put Hamon within approximately 12 miles[3] of McDavid's Nissan dealership located on the Gulf Freeway near Hobby Airport south of Houston. Hamon and McDavid are currently situated about 26 miles from each other.

McDavid timely protested Hamon's application[4] pursuant to section 4.06(c) of the TMVC Code. TMVC Code § 4.06(c) (West Supp.1999). After months of discovery, an evidentiary hearing was held in February 1997. The issue at the protest hearing was whether Hamon established good cause to relocate. Section 4.06 provides, in pertinent part:

> In determining good cause, the board shall consider:
>
> (1) whether the manufacturer or distributor of the same line-make of new motor vehicle is being adequately represented as to sales and service;

(2) whether the protesting franchised dealer representing the same line-make of new motor vehicle is in substantial compliance with his franchise agreement, to the extent that the franchise agreement is not in conflict with this Act;

(3) the desirability of a competitive marketplace;

(4) any harm to the protesting franchised dealer; and

(5) the public interest.

TMVC Code § 4.06(c).

Jerry Hamon, the owner of the appellant dealership, gave the following testimony at the hearing: there are a number of abandoned buildings in downtown Texas City, and the city's population is aging and declining in number. Most residents drive domestic cars and pickup trucks, not imports. Hamon is the only import dealer remaining in Texas City. Since the dealership began selling Nissans in 1985, Hamon has averaged about fifteen new Nissan sales per month, but it averaged only ten sales per month during the five-year period before 1997. Hamon lost approximately $118,000 in 1993 and 1994, $96,000 in 1995, and $145,000 in 1996. Hamon's current market consists of the communities of Texas City, La Marque, Hitchcock, Santa Fe, Dickinson, League City, Friendswood, Kemah, Baycliff, and Webster. Mr. Hamon testified that his dealership would better serve these communities from the League City property, since it is located on a major freeway closer to his customer base. Although Hamon outscored McDavid on a broad variety of measures in a Nissan customer-satisfaction survey, Mr. Hamon believed that his dealership was

2. The Gulf Freeway is the portion of Interstate Highway 45 that links Houston and Galveston; it passes several miles to the south of downtown Texas City. Hamon is not located on a major highway in its current location in downtown Texas City.

3. The ALJ found the distance to be 12.4 miles. While Hamon states that the distance could be as great as 12.4 miles depending on how the distance is measured, the parties appar-

ently agree that the actual straight-line distance is 11.8 miles. We do not consider the 0.6 mile difference between the two figures significant for purposes of this appeal.

4. McDavid had standing to protest because it is another franchised Nissan dealer located within a 15–mile radius of Hamon's proposed relocation site, and the proposed move is of a distance of more than one mile. *See* TMVC Code §§ 4.06(d)(2), (e)(1).

losing money in Texas City because location is more important than service to many customers.

At the hearing, appellant's counsel introduced a 1995 Nissan marketing survey of the Houston metro-area market and the deposition testimony of a Nissan market study manager. The study analyzed new-car registration data to calculate the performance of dealers within various census tracts known as primary market areas ("PMAs").[5] In the study, Nissan concluded that PMA 5, the south Gulf Freeway PMA in which McDavid operates,[6] "underperformed" in 1992 through 1994 by selling 1159 fewer new Nissans than expected for those three years, for an average annual underperformance of 367 vehicles. Underperformance was measured by comparing actual sales to a Texas standard created by averaging sales in other in-state urban areas. To remedy these lost sales opportunities, Nissan recommended reconfiguring the Houston metro market by creating a new PMA around League City for Hamon to serve from its new location. The creation of the new PMA 21 would involve reconfiguring McDavid's current PMA and transferring about 60,-000 households from McDavid's PMA 5 into Hamon's PMA 21. In 1995, Nissan approved Hamon's relocation, subject to Hamon's acquisition of the proposed site and construction of adequate facilities. Nissan did not participate in the protest proceedings now under review.

Dr. Robert Peterson, Hamon's business and marketing expert, defended the accuracy of the study's finding of underperformance and explained how that finding supported Hamon's proposed relocation. He testified that using a Texas standard of comparison to measure performance was reasonable. However, the record reflects that even a national performance standard would still show underperformance in PMA 5 of approximately 1000 vehicles in 1992–1994. Dr. Peterson also analyzed sales data for McDavid between 1993 and 1996 and determined that over half of its Nissan sales were fleet sales, a category in which Mr. Hamon testified he would be unable to compete.

David McDavid, the owner/operator of the appellee dealership, testified that McDavid has adequately represented Nissan from its Gulf Freeway location since 1984. Appellee's expert, Dr. John Hemphill, argued that a national standard was more appropriate in this case because a Texas standard is less statistically reliable and because Nissan has been a nationally marketed brand for over twenty years. Dr. Hemphill calculated substantially less underperformance in PMA 5 than Dr. Peterson found, and testified that this underperformance was inadequate to support another Nissan dealer in the southeast Houston market. Appellee questioned Hamon's fitness to serve the motoring public by pointing out (1) Hamon's inability to run a profitable dealership in twelve years of operation; (2) the absence of information about Hamon's projected costs and revenues at the proposed League City site; and (3) the fact that Hamon did not have a lease on, or ownership of, the proposed site. McDavid also argued that if Hamon relocated to League City, it would be close to the community of Clear Lake, and would be positioned to "steal" McDavid's sales from that largely white-collar, relatively affluent area. In support of this argument, McDavid presented evidence that new vehicle sales at its Honda dealership, which is located just south of its Nissan dealership on the Gulf Freeway, dropped by approximately 400 vehicles a

---

5. A PMA is defined as a specific geographic territory assigned to a particular dealer from which the dealer is expected to make most of its sales.

6. PMA 5 is comprised of the southeastern portion of Harris County and parts of Brazoria and Galveston counties. In its present location, Hamon is included in the two-dealer Galveston metro market, in what is designated as the Texas City PMA.

year after Clear Lake Honda began doing business 11 miles away.

The ALJ submitted to the Board a PFD that included a written opinion, findings of fact, and conclusions of law. In the opinion, the ALJ discussed the arguments and evidence offered by both parties and specifically addressed the section 4.06(c) factors. First, the ALJ was not persuaded that the creation of a new PMA for Hamon would automatically result in lost sales for McDavid, since McDavid could still advertise to households in Hamon's PMA and compete with Hamon for those sales. Nor would Hamon's greater proximity to McDavid cause McDavid certain harm, since price and service are equally important factors to customers as distance from home. The ALJ noted that McDavid's Clear Lake customers, many of whom commute to work in Houston, are just as likely to buy from a dealer located close to where they work or shop as from a dealer near their home. While McDavid Honda's sales dropped after Clear Lake Honda opened, McDavid Honda has remained profitable. The ALJ also observed that Hamon is already an established market presence in the southeast Houston area, as evidenced by the fact that Hamon is one of the most successful non-Houston dealers at attracting customers from the Houston metro area.

The following were included among the ALJ's findings of fact: Nissan is not adequately represented in either the Texas City PMA or the southeast Gulf Freeway PMA. Hamon's statistical methodology, which reasonably used a Texas standard of comparison, showed underperformance in PMA 5 of 1159 Nissan sales between 1992 and 1994; in comparison, the Houston metro market underperformed by only 322 units during the same period. The majority of competitive line-make dealers in the southeast Gulf Freeway area are located on the Gulf Freeway. Honda, Toyota and Mazda each have two dealerships within PMA 5's current boundaries. Both Toyota and Honda have outperformed Nissan in the Houston metro area and in PMA 5. The average distance between a Nissan dealership and its customers in the Houston metro area was 6.8 miles, a higher number than measured for Honda, Toyota or Mazda dealers in Houston.

The ALJ also found that the relocation would: (1) move Hamon closer to the market it already serves and be more convenient for its customers; (2) enhance Nissan's representation in the Houston metro market, especially the southeast portion; (3) increase inter-and intra-brand competition and promote the public interest; and (4) potentially result in more Nissan sales in the Houston market and PMA 5. In her conclusions of law, the ALJ determined that Hamon's relocation: (1) would not result in any appreciable harm or detriment to McDavid; (2) would promote a competitive marketplace in the Houston metro area; and (3) would serve the public interest. Therefore, the ALJ concluded, good cause existed to grant Hamon's application for relocation. The Board unanimously adopted the ALJ's recommendation, including her opinion, findings, and conclusions. The Board issued a final order dated September 18, 1997, allowing Hamon to proceed with relocation to League City, subject only to certain informational filings to be provided by Hamon as they became available.[7]

The ALJ rejected McDavid's assertion that Hamon's application was defective as a matter of law because Hamon did not present evidence of its economic viability at the proposed relocation site. McDavid's argument is based on section 4.02(a) of the Code, which states that an application for a dealer license shall include "information on the applicant's financial resources, business integrity, business ability and experience, franchise agreement if applicable,

---

7. The order required approval by the manufacturer and a copy of the lease or ownership documents for the new dealership facilities.

physical facilities, vehicle inventory, and other factors the board considers necessary to determine an applicant's qualifications to adequately serve the motoring public." McDavid's position is that section 4.02(a) requires a dealership applying for relocation to prove its economic viability [8] in the proposed relocation site; in this case, McDavid demanded that Hamon prove that it could make a profit in League City without taking sales away from McDavid. This "economic viability" argument was one of eight arguments McDavid raised in its appeal to the district court. The district court reversed the Board's final order without specifying the grounds for reversal.

Hamon raises seven points of error in this appeal,[9] which generally consist of responses to McDavid's arguments before the district court. In its first two points, Hamon argues (1) that the district court's judgment should be reversed because there is substantial evidence to support the Board's order, and (2) that Hamon was not required to prove its economic viability under section 4.02(a) of the Code as alleged by McDavid. In its remaining five points of error, Hamon asserts that the district court erred in (3) determining that the Board's order of September 18, 1997 was not a final order; (4) failing to dismiss McDavid's complaint for lack of subject-matter jurisdiction; (5) determining that Hamon failed to discharge its burden to show good cause for relocation; (6) determining that the agency order was defective in failing to contain a finding of fact or conclusion of law that there is good cause

for relocation; and (7) determining that the Board denied McDavid due process when it refused to allow McDavid to file a third brief.

## DISCUSSION

### *Standard of Review*

The district court reversed the Board's order without specific reference to any of the eight points of error McDavid raised in the suit for judicial review it filed in district court. Some of these points alleged that there was not substantial evidence to support various findings of fact and conclusions of law made by the ALJ. McDavid argues that because appellants did not timely request the district court to make findings of fact and conclusions of law, the district court's order must be upheld on any legal theory supported by the record. *See State v. Ruiz Wholesale Co.*, 901 S.W.2d 772, 777 (Tex.App.—Austin 1995, no writ). The Board agrees, stating that we must presume that the district court found all eight of McDavid's points of error meritorious.

*Ruiz Wholesale* involved an interlocutory appeal from an order denying a temporary injunction. *See id.* The rule it cites applies in this case, but not in the exact manner McDavid urges. While the district court's order must be upheld on any legal theory supported by the record, none of McDavid's individual substantial evidence challenges will sustain the district court's judgment of reversal unless McDavid's substantial rights have been prejudiced. *See* Tex. Gov't Code Ann.

---

8. "Economic viability" is a term McDavid used in its argument to the district court and on appeal to this Court; although the term does not appear in section 4.02(a), McDavid uses it as a general reference encompassing some of the elements listed in that section.

9. The Board raises four issues in its appeal, all of which restate claims made by Hamon in its seven points of error. Specifically, the Board's first issue reiterates Hamon's second point of error; its second issue restates Hamon's sixth point of error; its third issue repeats Hamon's seventh point of error; and

the Board's fourth issue is identical to Hamon's first point of error. Therefore, we will consider both appellants' arguments together and incorporate our treatment of the Board's issues by reference to Hamon's corresponding points of error.

McDavid raises nine issues on appeal. We have not summarized them because they are also duplicative of the issues raised by Hamon and the Board. However, we will identify McDavid's issues in the text to clarify our disposition of each of the issues raised.

§ 2001.174 (reviewing court shall reverse agency decision if appellant's substantial rights prejudiced because agency's findings, inferences, conclusions, or decisions not supported by substantial evidence, considering all reliable record evidence). Therefore, we believe that the proper approach under the APA is to consider all of McDavid's substantial evidence challenges together and treat the other issues raised as separate points of error.

### *"Economic Viability"*

We begin with Hamon's second and fifth points of error, in which it alleges that it was not required to prove "economic viability" to relocate, as alleged by McDavid in the latter's first and sixth issues. Hamon argues that protest proceedings are governed by section 4.06(c) of the TMVC Code, and that a dealer seeking to relocate is therefore not required to prove its economic viability under section 4.02(a). More specifically, Hamon argues that McDavid lacks standing to raise section 4.02(a) factors in a protest proceeding, and that these factors are irrelevant to the Board's determination of whether good cause exists for the relocation. McDavid's argument, which also lies at the heart of its substantial evidence challenge, is that the section 4.02(a) factors must be considered because there cannot be good cause to license a dealer that is unfit to serve the motoring public by virtue of its inability to achieve profitability. The Board adds that for over twenty years, it has interpreted the Code to require that relocation applicants in a protest proceeding need only show good cause as defined in section 4.06(c).

■ Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute. *See Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex.1993); *Stanford v. Butler*, 142 Tex. 692, 181 S.W.2d 269, 273 (1944). If the statute can reasonably be read as the agency has ruled, and that reading is in harmony with the rest of the statute, then the court is bound to accept that interpretation even if other reasonable interpretations exist. *See City of Plano v. Public Util. Comm'n*, 953 S.W.2d 416, 421 (Tex. App.—Austin 1997, no writ); *Quorum Sales, Inc. v. Sharp*, 910 S.W.2d 59, 64 (Tex.App.—Austin 1995, writ denied). With these rules in mind, we turn now to the text of the statute.

Section 4.02 is entitled "Dealer Application." The only portions of section 4.02 that pertain to relocation are subsections (a) and (d). Subsection (a) provides:

> An application for a dealer license shall be on a form prescribed by the board which shall include the information required by Chapter 503, Transportation Code, and information on the applicant's financial resources, business integrity, business ability and experience, franchise agreement if applicable, physical facilities, vehicle inventory, and other factors the board considers necessary to determine an applicant's qualifications to adequately serve the motoring public.

TMVC Code § 4.02(a). Subsection (d) states: "A dealer licensed hereunder shall promptly notify the [Motor Vehicle] Commission of any proposed change in its ownership, location, franchise, or any other matters the Commission may require by rule. Prior to a change in a dealer's location, a dealer shall obtain a new license for that location." *Id.* § 4.02(d).

■ The Board does not read section 4.02(a) to permit a protestant to challenge the adequacy of the economic information provided by a dealer seeking relocation. Section 4.02(a) makes no reference to protest proceedings, and it specifies no timetable for when the Board must be in possession of information regarding an applicant's financial resources and the other required data. The Board interprets section 4.02(a) as merely listing information a license applicant must pro-

vide to the Board before a license can be issued. It does not control or amend section 4.06(c), which establishes good cause as the sole relevant issue in a protest proceeding by stating that the Board "may deny an application to establish a dealership if, after protest, the applicant fails to establish good cause therefore." TMVC Code § 4.06(c). Both appellants argue that McDavid lacks standing to raise section 4.02(a) factors in a protest proceeding because a protestant may not intrude on the applicant's relationships with third parties such as landowners and manufacturers.

We find the Board's interpretation of these provisions reasonable. Section 4.06(c), which governs protest proceedings, makes good cause the sole inquiry in a protest proceeding; it contains no reference to any of the factors listed in section 4.02(a) that McDavid labels the "economic viability" factors. Conversely, nothing in section 4.02(a) suggests that a protestant is entitled to challenge an applicant's satisfaction of that section's requirements. To read the TMVC Code in such a way would effectively allow protestants to assume the Board's responsibilities. In addition, as the Board points out, removing the Board's flexibility to approve relocation pending the release of certain information such as manufacturer approval and property ownership leads to a "catch–22"[10] situation: the Board could not grant a dealer permission to relocate without the manufacturer's approval, but the manufacturer will not give the dealer advance approval for a facility of unknown size and location absent approval from the Board.[11] Similarly, the Board's interpretation avoids placing the relocating dealer in the situation of having to purchase or lease a desired relocation property without knowing whether the Board will grant its application to relocate. Therefore, the only requirement the Board has traditionally imposed at the section 4.06(c) stage of the licensing process is that the applicant be able to identify the relocation property by street address or legal description. We believe that the Board's longstanding interpretation of the TMVC Code in this regard—particularly the interplay between sections 4.02(a) and 4.06(c)—is reasonable. To the extent the district court based its judgment on McDavid's "economic viability" argument, we sustain the point of error raised in Hamon's second and fifth points of error and reject the arguments McDavid offers in its first and sixth issues.

### Substantial Evidence

We next consider the substantial evidence issues raised by the parties. The standard of review for an appeal of an agency order is well established: (1) this Court presumes that the Board's order is supported by substantial evidence, and McDavid has the burden to overcome this presumption; (2) the evidence in the record may preponderate against the decision of the agency and nevertheless amount to substantial evidence; (3) the true test is not whether the agency reached the correct conclusion but whether some reasonable basis exists in the record for the agency's action; (4) we will sustain the agency's order if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *See, e.g., Meier Infiniti Co. v. Motor Vehicle*

---

**10.** In Joseph Heller's novel of this title, American pilots in the second World War learned that they could not avoid flying bombing missions unless they were crazy; to be relieved from duty, they had to request a reprieve. The "catch–22" was that the very act of seeking to avoid hazardous combat duty demonstrated a pilot's sanity, thereby ensuring a denial of the request. *See* Joseph Heller, *Catch–22* 46 (1961).

**11.** Manufacturers will only approve sales facilities that comply with their facilities guide. However, a facilities guide is not issued until a planning volume is assigned to the dealership, which does not happen until the Board has approved the dealer's relocation in a final order.

*Bd.*, 918 S.W.2d 95, 98 (Tex.App.—Austin 1996, writ denied).

The issue before the Board was whether Hamon established good cause for relocation. *See* TMVC Code § 4.06(c). The ALJ found that McDavid was in substantial compliance with its franchise agreement, a finding not contested by the parties. Therefore, the remaining elements that the Board was required to consider in determining good cause were: (1) whether the manufacturer is adequately represented as to sales and service; (2) the desirability of a competitive marketplace; (3) any harm to the protesting dealership; and (4) the public interest. *See id.* We will set forth the evidence before the agency relating to each factor.

### Adequate Representation

■ Based largely on the 1995 Nissan study and the testimony of Hamon's expert, the ALJ determined that Nissan was not adequately represented in either McDavid's or Hamon's PMA. Hamon presented evidence showing underperformance in PMA 5 at an annual average of 367 vehicles. Although McDavid's expert claimed that the wrong performance standard was used, his testimony was impeached and the Board rejected that argument; furthermore, even the national standard sought by McDavid produced a nearly equivalent amount of underperformance.[12] The Nissan study showed that Honda, Toyota, and Mazda each have two dealerships within PMA 5's current geography. These competitors all have their dealerships located closer together than the 12 miles that would separate McDavid from Hamon if the latter relocated to League City. There is substantial evidence in the record to support the Board's determination that Nissan is not being adequately represented by its dealerships as they are presently configured.

### Harm to the Protesting Dealer

■ The Nissan market study found that McDavid was not adequately serving potential Nissan customers in the League City area because the dealership was located too far away to adequately serve this customer group. The study also demonstrated that only 9.1 percent of McDavid's sales came from the southeast in the direction of Hamon's proposed relocation site. It established significant underperformance in McDavid's PMA. The study also noted that major regional malls are located near both McDavid's present site and Hamon's proposed site in League City; the Board viewed this as evidence that two distinct markets already exist in the southeast Houston area, each independently capable of supporting a Nissan dealership. Finally, the record supports the Board's finding that over half of McDavid's Nissan sales from 1993 to 1996 were fleet sales, a segment of the market in which Jerry Hamon testified that his dealership would be unable to compete with McDavid.

McDavid argued at the agency hearing that reconfiguring the Houston market by creating a new PMA for Hamon around League City would directly harm McDavid by causing it to lose sales in that area. However, the Board reasoned that the lost sales would not be automatic; McDavid could still compete for customers in Hamon's PMA, and customers in neighboring areas such as Clear Lake might buy from McDavid because it is closer to where they work or shop. While the Board noted that Hamon's relocation would affect McDavid and result in increased competition, it concluded that this would not cause significant harm to McDavid, part of the well-established multi-line McDavid Auto Group, which reported $500 million in auto sales in 1996. We find that substantial evidence supports the Board's conclusion in this regard.

---

**12.** Although the Board made a finding of fact that using the national standard produced underperformance of 1100 vehicles for 1992– 1994, Hamon acknowledged that this was a typographical error and that 1000 was the correct number.

McDavid also argues: "Without knowing Hamon's break-even point at the proposed League City site, there is no rational way of knowing whether there is enough 'lost opportunity' available to Hamon at League City without seriously harming McDavid." Essentially, McDavid's argument is this: if Hamon's facilities are relatively inexpensive, it will be able to undersell McDavid and still make a profit. On the other hand, if its facilities are expensive, Hamon will be forced to make a high volume of sales to survive. Both scenarios, McDavid argues, lead to the same result: Hamon will take sales away from McDavid.

McDavid's argument proves too much. Hamon conceded—and the Board found—that its relocation would undoubtedly impact McDavid and cause increased competition. But as McDavid's argument shows, even if Hamon had provided data on its predicted costs in League City, that information would forecast increased competition for McDavid whether Hamon's anticipated costs were low or high. Section 4.06(c) does not require an applicant to supply this information, and we reject McDavid's argument that harm to the protestant cannot be calculated in its absence. We find that substantial evidence supports the Board's determination that Hamon's relocation will not cause McDavid significant harm.

### The Desirability of a Competitive Marketplace

█ The record evidence supports the Board's finding that Hamon's relocation will result in increased interbrand and intrabrand competition in the southeast Gulf Freeway area and the Houston metro market. McDavid does not challenge this finding; instead, it equates increased competition with harmful consequences to itself. We have already rejected this argument as a basis for overturning the Board's determination of good cause. The ALJ found that Hamon's proposed relocation site is located in an automobile dealership cluster; in her opinion, she reasoned that Hamon's relocation to the Gulf Free-

way will increase Nissan product awareness and encourage both intrabrand and interbrand competition. The Board was "persuaded that this is healthy competition which will benefit the public in this area." We find that substantial evidence supports its conclusion.

### The Public Interest

█ McDavid argues that the Board's finding and conclusion that Hamon's relocation would serve the public interest are not supported by substantial evidence. McDavid's argument is as follows: (1) Hamon has consistently lost money in Texas City; (2) Hamon did not present any financial data showing that it will be profitable in League City; (3) unprofitable dealerships do not serve the public interest. We reject this argument. First, McDavid is again attempting to challenge Hamon's relocation in a manner not contemplated by section 4.06(c). While Hamon is required to submit information on its financial resources and business experience to the Board, nothing in the TMVC Code allows McDavid to protest Hamon's relocation simply because it perceives Hamon's submission as inadequate.

Second, Hamon is seeking to relocate largely *because* it has been unprofitable in its current location. Texas City is in decline; in League City, however, Hamon would be positioned to reap the economic benefits of Houston's growth. If Hamon and Nissan agree that Hamon can serve its customers better and sell more cars in League City—and the Board has determined that good cause exists for Hamon to relocate—McDavid may not raise Hamon's sales history in Texas City to block Hamon's relocation. Third, while McDavid's statement about unprofitable dealerships may be true as a general matter, the Board concluded that Hamon can benefit from Nissan's underperformance in PMA 5, whether measured as 367 units annually or 333. We agree that the public interest will be served by the lower prices and better service that are the natural result of

increased competition, as well as shorter driving distances for customers to purchase and repair vehicles. The Board's conclusion in this regard is supported by substantial evidence.

The Board's decision was based on two days of testimony in which the ALJ heard from six witnesses, including three experts in the fields of automotive marketing and dealer location. The Nissan market study, containing 528 pages of data and analysis, made a detailed examination of the Houston metro market and concluded that Hamon should be allowed to move to League City in order to better serve its customers in that area. The Board relied on the Nissan study and the testimony of Hamon's witnesses, as it was entitled to do. After examining all the evidence pertaining to the four contested "good cause" factors, we find that substantial evidence supports the Board's determination that good cause exists for Hamon's relocation. Hamon's first point of error is sustained; we reject the arguments raised in McDavid's third, fourth, fifth, and seventh [13] issues.

### The Board's September 18 Order Was a Final Order

Hamon's third point of error alleges that the trial court erred in determining that the Board's order of September 18, 1998 granting Hamon's relocation application was not a final order. McDavid's second issue addresses the same question. Although we have sustained Hamon's first and second points of error, we will address the remainder of Hamon's points of error and McDavid's issues be-

cause the district court did not specify its basis for reversing the Board's order.

The Board's order states that Hamon's application to relocate to League City is approved "pending submission of current approval by the manufacturer and a copy of the current lease or ownership documents for the dealership facilities." McDavid argues that this language leaves the administrative process so open, unfinished, and contingent on future events that the order is not final. Hamon responds that the only contingencies involved in the Board's order are the informational filings required under section 4.02 of the TMVC Code. For its part, the Board contends that the processing of a license application under section 4.02 of the Code is effectively suspended until a protest is resolved in accordance with section 4.06(c); if the protest is denied, the application process resumes under section 4.02.[14]

Neither the APA nor the TMVC Code defines a "final order." The APA merely explains when an agency's decision becomes final; it does not explain what constitutes an ultimate decision. *See* Tex. Gov't Code Ann. § 2001.144 (West 1999). Both sides cite *Texas–New Mexico Power Co. v. Texas Industrial Energy Consumers,* 806 S.W.2d 230 (Tex.1991), as controlling authority on the question of when an agency order is final. In that case the supreme court held that although an order from the Public Utility Commission ("PUC") granting permission to build a power plant was made conditional on the receipt of permits from various state and

---

**13.** McDavid's seventh point of error argues that substantial evidence does not support the ALJ's Finding of Fact Number 69, which states: "The plans for the relocated Nissan facility includes [sic] increase [sic] showroom and service bay space and an increase in personnel." McDavid has not shown how this finding, even if inadequately supported, prejudices its substantial rights. *See* Tex. Gov't Code Ann. § 2001.174(2). Furthermore, we have already held that McDavid is not entitled to question the adequacy of Hamon's section 4.02(a) filings in a protest pro-

ceeding. The district court erred to the extent that it based its reversal on this ground.

**14.** The Board also argues that a protesting dealer does not have a right to join issue with the applicant on the informational filings required under section 4.02(a). We will assume without deciding that even if a protestant cannot base its protest on section 4.02(a) factors, it does have standing to contest the finality of the Board's order for an alleged lack of informational filings required under that section.

federal agencies, it was final and therefore appealable. The court noted that to hold otherwise would create a "catch–22" situation similar to the one in the present case: a utility would need PUC approval to begin plant construction, and to get PUC approval it would first need to obtain permits from various state and federal agencies; however, those agencies cannot issue all permits until construction has begun. *Id.* at 231–32. In rejecting the notion that an administrative order is not final if rights conferred therein are made contingent upon the occurrence of some future event, the supreme court observed:

> Government and business cannot work together when pointless delays stifle the very flame of initiative the law was designed to nurture.... A more pragmatic and flexible approach must be employed to evaluate the finality of an agency's order.... Although there is no single rule dispositive of all questions of finality, courts should consider the statutory context in which an agency operates, and should treat as final a decision "which is definitive, promulgated in a formal manner and one with which the agency expects compliance." 5 J. Stein, G. Mitchell & B. Mezines, *Administrative Law* 48–10 (1988). Administrative orders are generally final and appealable if "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." *Sierra Club v. United States Nuclear Regulatory Comm'n,* 862 F.2d 222, 224 (9th Cir. 1988).

*Id.* at 232 (footnote omitted).

The Board's order in the present case is final under the guidelines pronounced by the supreme court in *Texas–New Mexico Power Co.* The order was promulgated in a formal matter: it was approved by the Board in a properly called open meeting, based on a PFD issued after a hotly contested adjudicatory hearing. The Board clearly expects Hamon to comply with the order by refraining from doing business until the conditions are met and a license is issued. Finally, the Board's order fixes a legal relationship as a consummation of the administrative process, since McDavid's protest has been resolved with the Board's finding of good cause to relocate. We have already discussed how the Board's interpretation of the TMVC Code addresses issues of timing in a logical way that is appropriate within the structure of the TMVC Code. We therefore resolve in Hamon's favor the question of finality raised in Hamon's third point of error [15] and McDavid's second issue.

### The Board's Order Was Not Defective

◼ In its sixth point of error, Hamon urges that the district court erred in determining that the Board's order was defective in failing to contain a finding of fact or conclusion of law that good cause exists for Hamon's relocation. McDavid's eighth issue defends the district court's ruling on the same issue, arguing that the Board's order was defective.

Section 2001.141(b) of the APA states that an agency's decision "must include findings of fact and conclusions of law, separately stated." Tex. Gov't Code Ann. § 2001.141(b) (West 1999). Section 3.07(a) of the TMVC Code provides that the Board shall "include a separate finding of fact with respect to each specific issue the board is required by law to consider in reaching a decision." TMVC Code § 3.07(a)(1). McDavid argues that these statutes, read together, "required the Board to make a finding of fact or conclusion of law, separately stated, concerning whether or not Hamon had established 'good cause' for the relocation." We disagree.

First, we believe that the Board's order complies with both statutory requirements. The Board made a separate finding or conclusion for each of the five factors it

---

**15.** In its fourth point of error, Hamon argues that if the Board's order was not a final order, the district court erred in failing to dismiss McDavid's appeal for want of jurisdiction. Because we find that the agency order was final, we dismiss this point of error as moot.

was required to consider in determining good cause, complying with section 3.07 of the TMVC Code. It also separated its findings of fact and conclusions of law, as the APA specifies. We find no statutory requirement preventing the Board from making its "good cause" determination in the conclusion of the opinion section, when it has made the proper findings and conclusions in support of that determination.

Hamon argues that *Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12 (Tex. 1990), should be read to foreclose McDavid's attack. We agree. In *Goeke*, the supreme court addressed a similar argument that the PUC had not supported its statutory findings with a statement of the underlying facts in compliance with section 16(b) of the Administrative Procedure and Texas Register Act ("APTRA"). Tex.Rev. Civ. Stat. Ann. art. 6252–13a, § 16(b) (West Supp.1988), since repealed. In rejecting the challenge to the agency, the court stated:

> There is no precise form for an agency's articulation of underlying facts, and courts will not subject an agency's order to some "hypertechnical standard of review." What is important is that the findings serve the overall purpose evident in the requirement that they be made—i.e., they should inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review. We have also articulated the following more specific guidelines for underlying findings: (1) they must be more than mere recitals of testimony; (2) they should be stated as the agency's findings; and (3) they should relate to the ultimate statutory findings.

*Id.* at 15 (citations omitted).

In her conclusions of law, the ALJ determined that Hamon's relocation: (1) will

not result in any appreciable harm to McDavid; (2) will promote a competitive marketplace in the Houston metro area; and (3) will serve the public interest. These conclusions in Hamon's favor cover three of the five factors relevant to determining good cause under section 4.06(c). The ALJ made findings of fact that Nissan was not adequately represented and that McDavid was in substantial compliance with its franchise agreement, the remaining "good cause" factors.[16] Moreover, the ALJ's opinion states: "After consideration of the evidence and testimony presented in this matter, the ALJ concludes that Hamon has established good cause for the relocation of its Nissan dealership from Texas City, Texas to League City, Texas." The Board unanimously adopted the ALJ's entire PFD, specifically including her opinion, findings of fact, and conclusions of law.

McDavid does not claim that the Board's findings are mere recitals of testimony or that they are unrelated to the statutory elements of good cause; it argues only that the Board did not insert its conclusion finding good cause for relocation in the correct place. Under the standard set out in *Goeke*, McDavid's attack on the Board's order must fail. The Board's decision clearly informs the parties and courts of its determination of good cause and gives reasons for its conclusion. There is nothing unclear about the agency order; indeed, McDavid was sufficiently well-informed of the basis of the Board's decision to be able to make a successful appeal to the district court.

McDavid argues that *Goeke* is distinguishable because in that case, there was no contention that the PUC had failed to make any *ultimate* finding of fact or conclusion of law; rather, the issue was

---

**16.** While the Board found substantial compliance on McDavid's part, this finding would only appear to give McDavid standing to initiate the protest proceeding. We fail to see how a finding favorable to McDavid on this factor alone could override findings in Hamon's favor on the four "good cause" factors that are the more substantive factors in the equation.

whether the PUC had made sufficient *basic* findings of fact. We do not find this distinction meaningful in light of *Goeke*'s emphasis that providing fair notice to the parties is the real standard the agency's decision must meet. McDavid's challenge is precisely the type of "hypertechnical" attack we believe *Goeke* forbids. We sustain Hamon's sixth point of error and overrule McDavid's eighth issue.

### Due Process

In Hamon's seventh point of error, it alleges the trial court erred in finding that the Board denied McDavid due process in failing to allow McDavid to file a third brief at the hearing before the ALJ. McDavid's ninth issue addresses the same question but urges that the district court's decision to reverse was correct. We will briefly summarize the relevant facts.

At the conclusion of the evidentiary hearing, the ALJ directed Hamon and McDavid to file written closing arguments by April 4, 1997. Reply briefs responding to the closing arguments were due two weeks later for both parties. In its reply brief, Hamon impeached the testimony of McDavid's expert, Dr. Hemphill, by pointing out flaws in his methodology and arguing that he twice changed his methodology in order to make his calculations match a predetermined result. McDavid asked the ALJ for permission to file a second reply brief to respond to Hamon's criticisms, which the ALJ denied with the statement: "If upon further review of the posthearing briefs I feel there is a need for more discussion of Dr. Hemphill's testimony, I will advise both parties and establish an appropriate schedule for such filings." McDavid argued in its appeals to the district court and to this Court that the ALJ's refusal denied McDavid's rights to due process and due course of law under the federal and state constitutions. U.S. Const. amend. XIV; Tex. Const. art. I, §§ 13, 19.

The APA provides that in a contested case, each party is entitled to an opportunity to respond and to present evidence and argument on each issue involved in the case. *See* Tex. Gov't Code Ann. § 2001.051(2) (West 1999). The TMVC Code gives interested parties the right to cross-examine adverse witnesses and produce evidence on their own behalf. TMVC Code § 3.08(f). The Board has also adopted section 101.56 of its Rules of Practice and Procedure, which permits a hearing officer to alter the standard timetables for filing briefs. 16 Tex. Admin. Code § 101.56 (1998). McDavid asserts that the APA and the Board's rules secure the protestant's right to respond in writing to the applicant's arguments and to present written argument on each issue involved in the case. McDavid also claims that its right to be heard on all legal issues and questions of law was denied in this case. We disagree.

Due process involves basic notions of justice and fair play. *See United Indep. Sch. Dist. v. Gonzalez,* 911 S.W.2d 118, 125 (Tex.App.—San Antonio 1995), *writ denied,* 940 S.W.2d 593 (Tex.1996). "The sufficiency of procedures must be judged in the light of the parties, the subject matter and the circumstances involved." *Id.* (quoting *Brewer v. Austin Indep. Sch. Dist.,* 779 F.2d 260, 263 (5th Cir.1985)). An agency ALJ is a quasi-judicial officer whose decisions regarding procedural aspects of the hearing are reviewed for abuse of discretion. *See Meier Infiniti Co. v. Motor Vehicle Bd.,* 918 S.W.2d 95, 101 (Tex.App.—Austin 1996, writ denied).

Neither party has cited any cases that address this particular question, and we have found none. However, we believe that McDavid's asserted right to file a reply brief to address Hamon's impeachment of McDavid's expert does not follow from its right to present evidence on all legal issues. Although harm to the protesting dealership was an issue in this case, Dr. Hemphill's testimony was not. McDavid had adequate opportunity to present evidence on all issues; it could

have attempted to bolster Dr. Hemphill's testimony in either of two briefs had it chosen to do so. The fact that Hamon impeached Dr. Hemphill's testimony in its reply brief instead of in its closing argument does not amount to a constitutional violation. *See Railroad Comm'n v. Graford Oil Corp.*, 557 S.W.2d 946, 953 (Tex. 1977) (agency cannot adjudicate rights of interested parties without offering them "some kind of hearing"); *Meier Infiniti*, 918 S.W.2d at 101–02 (when protestant had five days and opportunity to cross-examine applicant's expert whose statement was allegedly changed before hearing, ALJ's denial of protestant's motion for continuance not abuse of discretion). The ALJ did not abuse her discretion by denying McDavid the opportunity to file a third brief. To the extent the district court relied on this argument as a basis for reversal, we sustain Hamon's seventh point of error and overrule McDavid's ninth issue.

### CONCLUSION

The sole issue in a protest proceeding, as dictated by section 4.06(c) of the TMVC Code, is whether good cause exists to allow the applicant to relocate its dealership. A protestant is not entitled to demand that the applicant produce evidence in the protest proceeding of information required by section 4.02(a), since that would essentially usurp the Board's role in the licensing process. The Board's interpretation of the interplay between these sections provides enough flexibility to allow the applicant to avoid a "catch–22" situation involving its right to possession of the relocation property and the manufacturer's assignment of a sales volume.

We also find that substantial evidence supports the Board's order allowing Hamon to relocate to League City. The other theories and issues raised by McDavid are without merit and cannot support the district court's judgment. We therefore reverse the district-court judgment and render judgment affirming the Board's final order.