GRAFF CHEVROLET COMPANY,
INC., Appellant,

v.

THE TEXAS MOTOR VEHICLE
BOARD; North Arlington Automotive
L.P., d/b/a Performance Chevrolet;
and General Motors Corp., Appellees.

No. 03–00–00772–CV.

Court of Appeals of Texas,
Austin.

June 14, 2001.

Mitchell Madden, Law Office of Mitchell Madden, Farmers Branch, for appellant.

Kristen L. Worman, Asst. Atty. Gen., Linda B. Secord, Asst. Atty. Gen., Austin, for Texas Motor.

Lloyd E. Ferguson, Merritt Spencer, Tiffany Gurkin Hildreth, Strasburger & Price, L.L.P., Austin, for General Motors.

Wm. R. Crocker, J. Bennett, Baskin Bennett & Komkov, L.L.P., Austin, for Performance.

Before Justices KIDD, B.A. SMITH and PURYEAR.

BEA ANN SMITH, Justice.

Appellee North Arlington Automotive, L.P., doing business as Performance Chevrolet (Performance), applied to the Motor Vehicle Board of the Texas Department of Transportation (the Board) to establish a new Chevrolet dealership in Arlington. Appellant Graff Chevrolet Company, Inc. (Graff), a Chevrolet dealer located in Grand Prairie, protested Performance's application. After the protest hearing, the administrative law judge (ALJ) issued a proposal for decision recommending denial of Graff's protest. The Board unanimously adopted the ALJ's proposal for decision, findings of fact, and conclusions of law. The Board denied Graff's motion for rehearing.

Graff sought judicial review of the Board's denial of the protest before the district court, which affirmed the Board's order. Graff appeals to this Court, arguing that the lower court's judgment affirming the Board's order violated Graff's right to due process, that the Board incorrectly examined the issue of "public interest" during the protest hearing, and that the lower court erred in denying Graff's request for remand. Because we conclude that there is substantial evidence to support the Board's decision, we will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Vandergriff Chevrolet (Vandergriff) completed relocation from its longtime home in north Arlington to a site along the Interstate 20 corridor in south Arlington. Vandergriff had been located in north Arlington for six decades, and its relocation left a vacancy in Chevrolet's representation in north Arlington. Gener-

al Motors (GM) planned to re-establish another Chevrolet dealership following Vandergriff's relocation and acquired property in north Arlington to house the new dealership. The new dealership point is located adjacent to Interstate 30 and is within a few hundred yards of several rival automotive dealerships. All Chevrolet dealerships in the area surrounding the new point with standing to protest the establishment of the new dealership signed a letter supporting the new point, including Graff. Al Graff, the father of current Graff owner Stan Graff, signed the letter, but his son did not. Al Graff subsequently applied for the new dealership. GM considered Al Graff and other dealers for the new dealership point, but instead selected and approved A.C. Croom, who had been involved in the automotive industry since 1986. Al Graff passed away in April 1997, leaving his son, Stan, in charge of the Graff dealership.

Croom filed an application with the Motor Vehicle Board for a new motor vehicle dealer license in May 1997 for a Performance Chevrolet dealership to be located at the new point in north Arlington. Graff filed a protest in June 1997, and GM filed a plea for intervention later that summer. In a protest proceeding, the applicant must show good cause for establishing the new dealership, or the Board may deny the application. Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 4.06(c) (West Supp.2001). The Board will consider five factors in determining whether there is good cause: (1) the adequacy of the manufacturer's or distributor's representation, (2) the protesting dealer's compliance with its franchise agreement, (3) the desirability of a competitive marketplace, (4) harm to the protesting dealer, and (5) the public inter-

est. *Id.* In the protest proceeding between Graff and Performance, both parties agreed that Graff complied with its franchise agreement, *see id.*, leaving the other four factors for the Board's consideration.

The ALJ conducted the protest hearing and heard evidence from all parties regarding the four remaining factors. Performance and GM presented evidence in the form of empirical data and expert testimony showing that the market will support the new Performance dealership, and Graff presented evidence that it will not. Dr. George W. Berry testified on behalf of Performance that there is an expected nominal growth in population and a substantial increase in the level of business activity and employment in Arlington and AGSSA 1,[1] where the new point is located. GM's expert witness, James Anderson, testified that there is a historical increase in the driving-age population in the area that is likely to continue. Graff's expert witness, Dr. Bernard L. Weinstein, agreed with many demographic assertions made by Dr. Berry but also offered testimony that certain boundaries, such as freeways and the Trinity River Basin, limit the actual geographic "advantage" attributable to the new point. The ALJ agreed with Performance and GM that Arlington, and specifically AGSSA 1, is a growing area with a positive economic future.

Additionally, Graff offered testimony that the area immediately surrounding the Graff dealership in Grand Prairie is in poor economic condition and will inevitably cause Graff to go out of business. Dr. Weinstein testified that the population in downtown Grand Prairie has been declining since 1990, that about seventy-five per-

---

1. AGSSA is an acronym for "Area of Geographic Sales and Service Advantage." Selected census tracts immediately surrounding each dealership make up each AGSSA, the area in which the dealer has a competitive advantage over other neighboring dealers. The new dealership point is located in AGSSA 1, and Graff is located in AGSSA 110.

cent of households within a one-mile radius of the dealership have annual incomes of less than $50,000, and that unemployment is around 9.7 percent within a two-mile radius of the dealership. Nonetheless, the ALJ determined that the overall unemployment rate in Grand Prairie is 4.2 percent, which is equal to the regional average, and that major retailers such as Target and Home Depot had recently relocated to south Grand Prairie, which demonstrates economic viability, not economic decline. Additionally, the ALJ noted that despite the dire economic findings Graff offered, Grand Prairie's uncertain economic status does not correlate with Graff's financial performance. Between 1992 and 1997, Graff's retail sales increased fifty-three percent, and profits for the same time period increased eighty-nine percent. The ALJ also observed that a "good portion" of Graff's new vehicle registrations in 1996 were within a two-mile radius of the dealership and that Graff's core market encompassed an area within a twenty-mile radius of the dealership, demonstrating that Graff is not seriously limited by its immediate surroundings in downtown Grand Prairie.

### Adequate Representation

Performance, GM, and Graff offered evidence regarding the adequacy of Chevrolet's representation in the Fort Worth area in accordance with section 4.06(c)(1). *See id.* § 4.06(c)(1). Performance and GM pointed out that Ford, Chevrolet's primary competitor, has eleven dealerships in the Fort Worth area, including two in Arlington. Chevrolet has only nine dealerships in the area, including Vandergriff in Arlington. Additionally, Anderson provided

data outlining Chevrolet's penetration rate in Texas, the greater Fort Worth area, the Fort Worth MDA,[2] and AGSSA 1 from 1994 to June 1997. This data showed that Chevrolet's penetration in AGSSA 1 was significantly below the state and area averages. Graff's expert argued that the use of the statewide penetration rate was improper because that standard is skewed by rural dealerships that face less interbrand competition and have a stronger market for popular Chevrolet pickup trucks than urban dealerships. Anderson responded by pointing out that even after the Texas rate is segmented,[3] Chevrolet is still not adequately represented in greater Fort Worth, the Fort Worth MDA, or AGSSA 1. Performance and GM also established that Ford, whose Texas standard should also be skewed by rural dealerships, was meeting and exceeding the Texas average penetration rate in Fort Worth. The ALJ made a finding of fact that Chevrolet is not being adequately represented in greater Fort Worth, the Fort Worth MDA, or AGSSA 1.

### Harm to the Protesting Dealer

Based on evidence presented at the protest hearing, the ALJ determined that the proposed Performance dealership in north Arlington will not significantly harm Graff. Graff contended that the dealership is on the brink of economic failure and if it were forced to compete with the new Performance dealership, Graff would have to shut down. The ALJ found that this argument was not supported by the facts, which show that Graff has been financially successful in the past and likely will continue to be in the future. First, Graff successfully competed with Vander-

2. MDA is an acronym for "Multiple Dealer Area," which is an area of responsibility assigned by a manufacturer to two or more of its dealers on a shared basis. Two or more AGSSAs make up an MDA.

3. Segmentation is a process in which the chosen standard is adjusted to account for differences in product preferences from market to market.

griff when it was in north Arlington. The new point is essentially the re-establishment of a north Arlington dealer, and should not pose an especially different economic threat than the Vandergriff dealership. Second, Graff has increased profits over the past several years even as it reduced advertising costs. Graff spent $315,000 in new vehicle advertising and made an average gross profit per vehicle of $1,500 in 1992; in 1997, Graff spent only $110,937 in new car advertising and made an average gross profit per vehicle of $1,547. Additionally, Graff spends $120 per unit in advertising costs even though other dealerships in the area spend about $307 per unit in advertising costs. Thus, Graff has the financial flexibility to adapt its advertising budget to compete with a north Arlington dealership. Third, Al Graff, a successful businessman, gave serious consideration to the prospect of applying for the new point and maintaining or selling the Graff dealership in Grand Prairie, which shows that he anticipated that the Graff dealership would continue to have value even after the re-establishment of the north Arlington dealership. The ALJ found that this evidence showed that the north Arlington dealership will not cause substantial harm to Graff.

Alternatively, Graff argued that there is not enough business to support both dealerships, so even if Graff were successful, Performance would not be. Performance and GM presented evidence to the contrary, asserting that Performance may capture some of the "lost opportunity"[4] sales in AGSSA 1. Anderson testified that Performance's capture of the lost opportunity could provide sufficient sales to meet or exceed Chevrolet dealer standards without treading upon Graff's customer base.

The ALJ found that the evidence supported a finding that the establishment of Performance in north Arlington carries no real prospect of significant harm to Graff.

### Desirability of a Competitive Marketplace

The ALJ found that the establishment of Performance in north Arlington would promote a competitive marketplace based on evidence presented by Performance and GM that a north Arlington dealership will renew Chevrolet's presence in AGSSA 1 and provide customers with more convenience and choice in dealerships. Graff counters this argument, stating that the new dealership will not promote competition because the market for Chevrolet products is saturated. The ALJ found that Graff's assertion lacked corroboration and determined that the new dealership will provide more customer service and convenience and will promote a competitive marketplace.

### Public Interest

The evidence Performance and GM presented to show that the new dealership will be in the public interest outweighed the arguments Graff presented, in the ALJ's judgment, and the ALJ correspondingly found that the establishment of the Performance dealership is in the public interest. Graff argued that Graff was denied fair consideration for the new point because the point was a designated "minority point," and thus Croom, as an African American, was given unfair consideration. Alternatively, Graff posited that Croom is not financially qualified and lacks the necessary qualifications and experience to run a dealership. The ALJ found that there was very little credible evidence to support the assertion that the north Arlington site was a designated "minority

4. "Lost opportunity" is used in this context to refer to lost sales resulting from "insell." Insell in this case is the sale of Chevrolet vehi- cles to residents of AGSSA 1 from dealers located outside the Fort Worth and Dallas MDAs.

point," and that Graff's other arguments were based on the factors in section 4.02(a) of the Motor Vehicle Code. *See* Act of May 16, 1995, 74th Leg., R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex.Rev.Civ. Stat.Ann. art. 4413(36), § 4.02(a), since amended). The ALJ found Graff's attacks on Croom's qualifications under section 4.02(a) to be irrelevant based on this Court's decision in *Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 313 (Tex.App.—Austin 1999, pet. denied). GM and Performance argued that the re-establishment of a north Arlington dealership will be in the public interest because it will restore service to the residents of north Arlington, will increase Chevrolet's visibility along the Interstate 30 corridor in Tarrant County, will create new jobs, and will provide the community with a successful, minority-run business. The ALJ determined that the evidence in favor of Performance outweighed the evidence presented by Graff and entered its finding of fact that the new dealership will serve the public interest.

## DISCUSSION

Graff raises seven issues in its appeal. Graff argues in part that the proposal for decision adopted by the Board deprived Graff of due process and that the district court erred in not granting Graff's request for remand. Graff's five remaining arguments hinge upon the Board's examination of the public interest factor cited in section 4.06(c). *See* Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 4.06(c). Additionally, the Board filed a motion to strike certain portions of Graff's brief from the court's record.

### Standard of Review

■ This Court presumes that the Board's order is supported by substantial evidence, and Graff has the burden to overcome this presumption. *See Meier*

*Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 98 (Tex.App.—Austin 1996, writ denied). The Administrative Procedure Act (APA) authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2000). The evidence in the record may preponderate against the decision of the agency and nevertheless amount to substantial evidence. *Meier*, 918 S.W.2d at 98. The true test is not whether the agency reached the correct conclusion but whether some reasonable basis exists in the record for the agency's action. *Id.* We will sustain the agency's action if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Id.*

### Due Process

■ Graff contends that the ALJ's proposal for decision was improper because the language in the decision reflected "zealous advocacy of a predetermined result." The language the ALJ used to characterize Graff's evidence reflected not a predetermined bias but an opinion reached *after* full consideration of the evidence presented in the hearing. Graff's assertion misconstrues the purpose of a proposal for decision which must recommend a result and contain "a statement of the reasons for the proposed decision and of each finding of fact and conclusion of law necessary to the proposed decision." Tex. Gov't Code Ann. § 2001.062(c) (West 2000). A proposal for decision is not supposed to be a neutral, detailed reflection of the record, but a summary of the presented evidence and the ALJ's recommendation regarding the just result of the dispute. The ALJ's proposal for decision

reflected the ALJ's determination of the evidence in accordance with section 2001.062(c) of the Government Code. *See id.* We overrule Graff's first point of error.

### Public Interest

■ According to section 4.06(c) of the Motor Vehicle Code, the Board must make an ultimate finding of good cause before granting a license to an applicant for a new motor vehicle dealership when the application has been protested by an existing dealer. Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 4.06(c). That section sets out five criteria that must be considered in the Board's determination of good cause:

(1) whether the manufacturer or distributor of the same line-make of new motor vehicle is being adequately represented as to sales and service;

(2) whether the protesting franchised dealer representing the same line-make of new motor vehicle is in substantial compliance with his franchise agreement, to the extent that the franchise agreement is not in conflict with this Act;

(3) the desirability of a competitive marketplace;

(4) any harm to the protesting franchised dealer; and

(5) the public interest.

*Id.* Graff's complaint focuses on the public interest factor. Graff argues that to be meaningful, the public interest factor must encompass something other than the other four elements comprising good cause. Graff asserts that public interest must therefore include economic fitness and the

other licensing qualifications listed under section 4.02(a). *See* Act of May 16, 1995, 74th Leg., R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex.Rev.Civ.Stat. Ann. art. 4413(36), § 4.02(a), since amended).[5]

Graff's attempts to challenge Croom's economic fitness to serve as a dealer have been foreclosed by our decision in *Hamon. See Hamon,* 997 S.W.2d at 313. There, we upheld the Board's reading of the statute that under section 4.06(c), a protestant such as Graff lacks standing to raise the economic viability of the dealer it is challenging. *Id.* at 305–06. While *Hamon* involved a challenge to the relocation of a dealership, the same principle applies in a proceeding under section 4.06(c) to challenge a new dealership:

Section 4.06(c), which governs protest proceedings, makes good cause the sole inquiry in a protest proceeding; it contains no reference to any of the factors listed in section 4.02(a) that McDavid labels the "economic viability" factors. Conversely, nothing in section 4.02(a) suggests that a protestant is entitled to challenge an applicant's satisfaction of that section's requirements. To read the [Motor Vehicle] Code in such a way would effectively allow protestants to assume the Board's responsibilities.

*Id.* at 306. The factors in section 4.02(a) are considered by the Board in its determination to grant Croom's application for a dealership and may not be second-guessed by Graff in his protest proceeding.

In *Hamon,* we held that the only inquiry in a protest proceeding is good cause. *Id.* at 313. Graff seeks to avoid our ruling by

---

5. Section 4.02(a) sets out the criteria the Board "considers necessary to determine an applicant's qualifications to adequately serve the motoring public," including "the applicant's financial resources, business integrity, business ability and experience, franchise agreement if applicable, physical facilities, vehicle inventory, and other factors." Act of May 16, 1995, 74th Leg., R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex.Rev. Civ.Stat.Ann. art. 4413(36), § 4.02(a), since amended).

importing economic factors into the definition of public interest, one of the five elements of good cause. He argues that public interest must mean something more than the sum of the other four elements of good cause. While the Board may consider other factors in determining what is in the public interest, under our holding in *Hamon*, it may not consider the economic factors listed in section 4.02(a). *See id.* at 306. Graff does not have standing to raise questions about Croom's economic fitness as a dealer.

Graff responds that if *Hamon* means that the public interest element of good cause does not include economic fitness of the challenged dealer and if it means that he does not have standing to raise such issues in a protest proceeding, then *Hamon* goes too far and needs to be revisited. That is how we read *Hamon*, and we decline to revisit that holding for the reasons we have expressed. Nothing in section 4.02(a) grants a protestant the right to challenge the Board's decision to grant an application for a dealership, and nothing in section 4.06(c) suggests that the economic fitness of the dealer in question is a factor when a protesting dealer asks the Board to determine if there is good cause to create or relocate a dealership. *See* Act of May 16, 1995, 74th Leg., R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex.Rev.Civ. Stat.Ann. art. 4413(36), § 4.02(a), since amended); Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 4.06(c). We reject Graff's proposal that the public interest element of good cause must include consideration of the economic fitness of the dealer. We turn, then, to Graff's complaint that the Board's decision on the public interest factor was not supported by substantial evidence.

■ The Board points out that the establishment of Performance Chevrolet will, among other things, enhance competition between Chevrolet and its rivals, create new jobs, and provide a successful minority-run dealership in the community. These factors all pertain to the public interest, and the Board's determination that the new dealership will serve the public interest was supported by substantial evidence.

■ Graff offers three reasons to reverse the Board's finding that a new dealership will serve the public interest: that there was a "more viable alternative" for the new dealership (namely, Graff itself), that Croom is not qualified to be a dealer, and that the parties involved in the dealer selection process were "improperly motivated." These three issues have no practical bearing on a substantial evidence review of a section 4.06(c) protest proceeding. Even though there may exist a more viable alternative for the new point, that does not preclude a finding that there was substantial evidence to support the Board's approval of Performance, given that the evidence may preponderate *against* the Board's decision and still amount to substantial evidence. *See Hamon*, 997 S.W.2d at 306. Croom's qualifications to be a new motor vehicle dealer fall under section 4.02(a) and are subject to examination in the initial licensing application, and absent fraud or malfeasance, may not be raised in a protest proceeding.[6] *See id.* Finally, the Board found no evidence that any of the

---

**6.** Additionally, Graff asserts that there was not substantial evidence to support the Board's finding that Performance's license application was in the public interest because, Graff argues, Croom is not financially qualified to be a dealer and lacks the requisite dealer experience. These assertions, if true, do not negate the many facts the Board found that characterize Croom as a potentially successful dealer and do not merit a finding that the Board's decision did not stem from a reasonable basis.

parties involved in the dealer selection process were not properly motivated. Graff intimated that GM's reasons for choosing Croom for the new dealership were not based on normal business considerations, but Graff provided no evidence to support that assertion during the protest hearing. The ALJ determined that the evidence showed no wrongdoing on the part of Croom or his financial backers and that selecting Croom as dealer-operator for the new point is not contrary to the public interest. In conducting a substantial evidence review, this Court may not substitute its judgment for those findings of the Board that have substantial support in the evidence. *See Tex. State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex.1988).

We conclude that the Board properly considered the public interest factor in determining good cause under section 4.06(c). Accordingly, we overrule Graff's second, third, fourth, fifth, and sixth points of error.

### Remand Issue

Section 2001.175(c) of the Texas Government Code states that the court may remand a case to the state agency *if* the court is satisfied that the additional evidence presented is material and that there were good reasons for the failure to present it in the proceeding before the ALJ. Tex. Gov't Code Ann. § 2001.175(c) (West 2000). Graff conceded during oral argument that if we do not adopt its proposed definition of public interest, there is no reason to remand this case for further consideration by the Board. Because of our holding, we overrule the request for a remand.

### Motion to Strike

We overrule the Board's motion to strike the six proposals for decision that Graff included in its brief, but note that

consideration of those proposals is irrelevant to the outcome of this case in light of *Hamon.*

### CONCLUSION

Our holding in *Hamon* precludes Graff's attempts to raise the economic fitness of Croom in this protest proceeding. Nor does the definition of public interest, one element of good cause, put into issue the economic viability of the challenged dealer. We overrule Graff's due process issue and find that substantial evidence supports the Board's determination of good cause to establish a new dealership at this point. We therefore affirm the district court's judgment and the order of the Board.