# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

### NO. 03-05-00320-CV

**Roland F. Chalifoux, Jr., D.O., Appellant**

**v.**

**Texas State Board of Medical Examiners and Donald W. Patrick, M.D., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. GN402591, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

To respond to allegations raised in the motion for rehearing, we withdraw our prior opinion and judgment issued on June 2, 2006, and substitute this opinion in its place. After addressing the concerns raised, we overrule appellant's motion for rehearing.

Roland Chalifoux, D.O., appeals the district court's final judgment affirming the final order of the Texas State Board of Medical Examiners (the Board), revoking his license to practice medicine in Texas. Dr. Chalifoux claims that the Board violated his due process rights in prosecuting its complaint against him, that the final order was arbitrary and capricious, and that the

final order is not supported by substantial evidence. Because we find no error in either the Board's actions or the final order, we affirm the district court's judgment.

**BACKGROUND**

Dr. Chalifoux graduated from the University of New England College of Osteopathic Medicine in 1987. He received training in neurosurgery during his five-year residency at Horizon Health System in Warren, Michigan. He also completed a six-month neurological fellowship at Allegheny General Hospital in Pittsburgh, Pennsylvania. At Allegheny, he gained clinical experience in about 100 cerebral aneurysm cases. In 1995, he relocated to Texas and served as an assistant professor at the University of North Texas Health Science Center until 1997. In 1997, he went into private practice in Fort Worth. Between 1995 and 2002, Dr. Chalifoux performed approximately 1,000 surgeries as the primary surgeon. In 1998, the American Osteopathic Association granted Dr. Chalifoux board certification in neurosurgery.

In July 2002, the Board docketed a formal disciplinary complaint against Dr. Chalifoux, which it subsequently amended in September and October. In its complaint, the Board alleged that Dr. Chalifoux's treatment of 13 patients fell below the accepted standard of care and constituted unprofessional or dishonorable conduct under the Medical Practices Act (the Act). The complaint was referred to the State Office of Administrative Hearings, and a hearing was held before an Administrative Law Judge (ALJ) in late October and early November.[1] After a full evidentiary

---

[1] The ALJ who presided over Chalifoux's administrative hearing left the State Office of Administrative Hearings prior to issuing a proposal for decision. Consequently, two ALJs were appointed to review the record and issue a proposal for decision.

hearing, the ALJs issued a proposal for decision concluding that Dr. Chalifoux violated accepted medical standards and failed to practice medicine in an acceptable professional manner in treating three patients: E.F., C.Y., and A.J. Because the ALJs found Dr. Chalifoux's care of these three patients to be deficient, we will discuss individually the factual background relating to his treatment of each patient.

**Patient E.F.**

On October 14, 1996, E.F., a sixty-one-year-old male, went to the emergency room of the Osteopathic Medical Center of Texas complaining of numbness and tingling in his right face, arm, and leg, as well as slowed motion and weakness. A CT scan was performed, and he was diagnosed with transient ischemic attacks (TIAs).[2] In addition, the CT scan revealed a fusiform giant aneurysm involving the right carotid artery.[3] However, it was determined that the aneurysm was not causing the TIAs. E.F. was referred to Dr. Chalifoux for a neurological consultation.

Dr. Chalifoux felt that the appropriate treatment for E.F. would be anticoagulation therapy. Dr. Chalifoux noted that if E.F.'s aneurysm developed a leak while undergoing anticoagulation therapy, there could be severe bleeding and possibly death. Consequently, Dr. Chalifoux concluded that an attempt should be made to attenuate the blood flow to the aneurysm before starting the anticoagulation therapy.

---

[2] The phrase "transient ischemic attacks" is used in the record to describe the symptoms caused by a temporary disruption of the blood supply to the brain and is sometimes referred to as a mini-stroke.

[3] Testimony at Chalifoux's administrative hearing established that a giant aneurysm is one that is greater than 2.5 centimeters in size.

On October 18, four days after E.F. was admitted to the hospital, Dr. Chalifoux performed an exploratory craniotomy, assisted by Dr. John Payne. Once the aneurysm was exposed, Dr. Chalifoux discovered that a bypass was impossible. Instead, Dr. Chalifoux decided to temporarily clip the internal carotid artery to reduce blood flow to the aneurysm. Clipping the internal carotid artery would also reduce blood flow to the right side of the brain. Accordingly, Dr. Chalifoux ordered an intraoperative angiogram to evaluate cross-over blood flow from the left side of the brain to the right side. The angiogram indicated that blood was flowing into the right middle cerebral and the right anterior cerebral arteries. An intraoperative Doppler[4] was also performed and it identified good pulsation distally of the right middle cerebral artery bifurcations. Based on these findings, Dr. Chalifoux made the temporary occlusion permanent. While the intraoperative tests demonstrated that the clip did not prevent blood from flowing from one side of the brain to the other, Dr. Chalifoux acknowledged that "only time would tell if the blood flow was in fact adequate to decrease [E.F.'s] chance of stroke."

On October 19, the day after surgery, E.F. did not wake up. His condition deteriorated, and he became comatose. A CT scan performed on October 21 showed a severe infarct of the right hemisphere of E.F's brain. E.F. was declared dead on October 22.

At Dr. Chalifoux's administrative hearing, the Board argued that the occlusion of E.F.'s carotid artery fell below the acceptable standard of care and resulted in E.F.'s death. Specifically, the Board insisted that (1) no life-threatening emergency required immediate surgery, (2) it was inappropriate for Dr. Chalifoux to perform a surgery that he had never performed as

---

[4] The Doppler method uses sound waves to detect blood pressure.

4

primary surgeon, and (3) a balloon temporary occlusion (BTO test) should have been performed to determine any potential adverse effects that may have resulted from occluding the carotid artery. To support its position, the Board relied on the testimony of Dr. Martin Barrash and Dr. Arthur Evans, as well as the deposition of Dr. Issam Awad.

Dr. Barrash has been a licensed physician for 36 years and was board certified by the American Board of Neurological Surgery in 1974. Dr. Barrash described E.F.'s surgery as "[a] poorly conceived unnecessary operation done poorly with disastrous results." Dr. Barrash stated that, when a surgeon is contemplating a permanent occlusion of a cerebral artery, a BTO should be performed. He explained that a BTO is "a preoperative test where you can determine if by occluding a vessel the patient will have neurological deficit. . . . And if the patient has no symptoms, then [a permanent occlusion is] probably safe." Dr. Barrash testified further that the preoperative and intraoperative tests performed on E.F. were sufficient to establish the existence of blood flow in E.F.'s brain after the carotid artery was clipped but were insufficient to determine whether the blood flow would be adequate to prevent brain damage or death. Dr. Barrash maintained that the occlusion took place "when it was not safe and caused a stroke, an infarct, which caused the patient's death." He concluded that Dr. Chalifoux's treatment of E.F. fell below the accepted standard of care.

On cross-examination, Dr. Barrash admitted that he could not predict what would have happened if E.F.'s aneurysm had gone untreated. He also acknowledged that there are risks associated with a BTO. However, he insisted that, based on the information provided to him, the aneurysm should not have been touched.

5

Dr. Arthur Evans, a neurosurgeon, testified that E.F.'s situation did not require that the aneurysm be treated before the TIAs could be medically addressed. Dr. Evans agreed with Dr. Barrash that a BTO should have been performed before occluding E.F.'s carotid artery but noted that he would not have operated in this instance. He also claimed that Dr. Chalifoux never took the necessary steps to determine whether there would be adequate blood flow in the brain after he clipped E.F.'s carotid artery. Dr. Evans asserted further that it was inappropriate for Dr. Chalifoux to perform such a complex surgery when he had never been the primary surgeon in a surgery of this type. He concluded that Dr. Chalifoux's care was "substandard."

Dr. Issam Awad, a professor of neurosurgery at the University of Colorado Health Sciences Center, testified by deposition. Dr. Awad stated that the TIAs experienced by E.F. were not related to his aneurysm and were not life-threatening. He claimed that it would be a deviation from the standard of care not to perform a temporary occlusion, such as a BTO, before performing surgery to occlude the carotid artery. However, he admitted that he "would not recommend proceeding with [a] test occlusion in the midst of TIAs, nor would [he] recommend proceeding with treatment of an aneurysm unrelated to those TIAs." Dr. Awad criticized Dr. Chalifoux for performing an elective surgery that Dr. Chalifoux had not done before in a non-life-threatening situation. Dr. Awad insisted that E.F.'s brain infarction was caused by the occlusion of the carotid artery. In the report he prepared after reviewing E.F.'s case, Dr. Awad concluded:

> [Dr. Chalifoux] erroneously justified extremely risky surgical intervention on a formidable cerebrovascular lesion which he knew was not contributing to [E.F.'s] ongoing neurologic symptoms at the time. His reasoning in justifying the surgical intervention was negligently flawed, in that there was little likelihood that he would be able to accomplish the surgical intervention without harming the patient, and even

6

lesser likelihood that he would be able to treat the patient with anticoagulation soon thereafter for presumed progressive ischemia on the other side. In my opinion, there was no absolute indication to treat [E.F.] with anticoagulation in the first place, and no contraindication to using this treatment under controlled conditions and for a very short period of time in the setting of any unruptured aneurysm.

On cross-examination, Dr. Awad conceded that it was reasonable to explore the aneurysm to see if the carotid artery could be preserved but reiterated that first a BTO should have been performed. He agreed with Dr. Chalifoux that if the aneurysm ruptured while E.F. was on anticoagulation drugs, the bleeding would likely be catastrophic.

Dr. Chalifoux insisted that he properly treated E.F. He argued that E.F. required surgical treatment because of the high mortality rate associated with this type of aneurysm. He also explained that the surgery was not done immediately, but four days after E.F. was admitted to the hospital. Dr. Chalifoux maintained that he discussed with E.F. and his wife all of their options and the family chose to proceed with the surgery. He claimed further that he had been involved in hundreds of surgeries of this type.

On cross-examination, Dr. Chalifoux agreed that the TIAs were not related to E.F.'s aneurysm. He also conceded that the preoperative and intraoperative tests he performed on E.F. indicated only that there was blood flowing across E.F.'s brain, not whether that flow was adequate to maintain brain tissue. He testified that he decided to permanently clip the carotid artery even without evidence of the adequacy of the resulting blood flow. He testified further that he had observed the clipping of five giant aneurysms but that this was the first time that he had ever clipped a giant aneurysm on his own patient. Finally, he admitted that, in a prior civil deposition, he testified that E.F.'s fatal stroke was caused by the clipping of the aneurysm.

7

In his defense, Dr. Chalifoux relied on the expert testimony and reports of several prominent physicians. Dr. Keith Kattner testified that Dr. Chalifoux's treatment of E.F. was appropriate under the circumstances. Dr. Takanori Fukushima of the Carolina Neuroscience Institute submitted a report on Dr. Chalifoux's behalf. Dr. Fukushima stated that Dr. Chalifoux's attempted repair of the aneurysm was reasonable in order to treat E.F. with anticoagulation therapy. Dr. Fukushima opined that it was a good decision to operate and that E.F.'s post-surgical complications should not reflect adversely on Dr. Chalifoux. Dr. Julian Bailes, a neurosurgeon on staff at the University of West Virginia, testified by deposition. He insisted that E.F.'s aneurysm was life-threatening and that it needed to be repaired before anticoagulation therapy began. However, he agreed that E.F.'s death likely resulted from an infarct caused by clipping the carotid artery. Finally, Dr. Wolff Kirsch testified that "there is no evidence in [E.F.'s] record or in the world's literature that [Dr. Chalifoux's] decision to operate, hope for some control of the aneurysm, and count on cross circulation to carry the day was wrong."

The ALJs found that Dr. Chalifoux's treatment of E.F. fell below the accepted standard of care and resulted in E.F.'s death.

**Patient C.Y.**

C.Y.'s neurologist, Dr. Paul Flaggman, performed an MRI, which demonstrated an arteriovenous malformation (AVM) in her brain. In November 1996, C.Y. began having occasional seizures. Dr. Flaggman prescribed Dilantin to control the seizures and referred C.Y. to Dr. Chalifoux for a neurosurgical consultation. Dr. Chalifoux examined C.Y. and determined that the AVM was the likely cause of the seizures. On July 7, 1997, Dr. Chalifoux surgically excised the

AVM without complication. In the days following the surgery, C.Y.'s doctors had trouble maintaining the proper level of Dilantin in her system. Nevertheless, C.Y. was discharged on July 14. That same day, she was admitted to another hospital after having a grand mal seizure. Her doctors concluded that the seizure was the result of a sub-therapeutic Dilantin level. On July 19, C.Y. was discharged from the hospital.

At the administrative hearing, the Board argued that C.Y.'s July 14 seizure resulted from Dr. Chalifoux's failure to stabilize her Dilantin level before discharging her from the hospital. Dr. Barrash testified that it was dangerous to discharge C.Y. with sub-therapeutic Dilantin levels. Dr. Evans explained that a therapeutic level of Dilantin normally ranges between 12 and 20; C.Y.'s Dilantin level was 3.9 when she was initially discharged on July 14. Dr. Evans asserted that C.Y. was prematurely discharged based on her low Dilantin level.

Dr. Chalifoux acknowledged that C.Y.'s Dilantin level was sub-therapeutic when she was initially discharged. However, he noted that she had not had a seizure since July 10 and that seizures can be expected after AVM surgery. Dr. Chalifoux also admitted a letter from C.Y. stating that she was pleased with Dr. Chalifoux's care and has since resumed a normal life. Dr. Kirsch and Dr. Eugene George, a neurosurgeon, both agreed that a seizure after AVM repair is expected. Dr. Kirsch also stated that he believed C.Y.'s Dilantin dosage to be appropriate under the circumstances. However, Dr. George asserted that C.Y.'s low Dilantin levels should have caused concern.

The ALJs found that Dr. Chalifoux's post-surgery management of C.Y.'s seizures fell below the accepted standard of care because Dr. Chalifoux discharged C.Y. from the hospital when

she had a sub-therapeutic level of Dilantin. Consequently, the ALJs found that C.Y.'s sub-therapeutic Dilantin level caused her post-discharge seizure.

**Patient A.J.**

A.J. injured her back at work and in an automobile accident in 1997. In April 1997, Dr. Chalifoux performed a two-level posterior lumbar interbody fusion on A.J. On June 10, 1998, Dr. Chalifoux performed a second operation on A.J. to remove and reset the spinal implants put in place during the first operation. During the second surgery, Dr. Chalifoux was forced to remove a large amount of scar tissue and patch a dural tear. In the days after the second surgery, A.J. complained of intermittent headaches when walking but not when sitting. On June 13, Dr. Chalifoux withdrew some reddish fluid from beneath A.J.'s incision. Dr. Chalifoux did not believe that the liquid was cerebrospinal fluid (CSF), but instructed A.J. to lie on her side for two hours in order to monitor any drainage from her wound. If the drainage was CSF, Dr. Chalifoux expected it to re-accumulate and drain noticeably. No drainage was noted, and A.J. was discharged that afternoon. The next day, A.J. was readmitted to the hospital after complaining of significant leg pain, a headache, and wound drainage. After three more surgeries, A.J.'s dural tear was successfully patched and the wound drainage subsided.

At Dr. Chalifoux's hearing, the Board argued that he discharged A.J. when he should have known that she had a CSF leak. Dr. Barrash claimed that Dr. Chalifoux should not have had to repair the dural tear three times to stop the leak and that dural leaks should not be common. Dr. Barrash opined further that Dr. Chalifoux demonstrated a complete lack of knowledge regarding the treatment of CSF leaks. Dr. Evans agreed that Dr. Chalifoux should have realized that the fluid he

10

removed from A.J.'s wound prior to her initial discharge was CSF. Dr. Chalifoux testified that dural tears are a common complication of spinal surgery.

The ALJs found that dural leaks such as A.J.'s cause headaches and drain more when the patient is upright because of the increase in hydrostatic pressure. Because Dr. Chalifoux's decision to have A.J. lie down for two hours prior to discharge minimized the hydrostatic effects of the CSF leak, the ALJs found that he did not use a reasonable procedure for determining whether the drainage from her wound was the result of a CSF leak. Consequently, the ALJs found Dr. Chalifoux's June 13 discharge of A.J. to be substandard.

**Final Order**

In their proposal for decision, the ALJs concluded that Dr. Chalifoux (1) violated an accepted medical standard of care in his treatment of E.F., C.Y., and A.J.; (2) failed to practice medicine in an acceptable professional manner; and (3) committed unprofessional conduct that was likely to injure the public. In conclusions of law 12 and 13, the ALJs recommended that the Board suspend Dr. Chalifoux's medical license for a period of five years and determined that an administrative penalty was inappropriate under the circumstances. The Board reviewed the ALJs' proposal for decision and adopted all of the proposed findings of fact and conclusions of law except for conclusions of law 12 and 13, which it considered to be "recommendations" rather than proper conclusions of law. The Board revoked Dr. Chalifoux's license rather than suspend it for five years. Dr. Chalifoux sought judicial review of the Board's order in district court. After a hearing on the merits, the district court affirmed the Board's final order. This appeal followed.

11

## DISCUSSION

**Substantial Evidence**

In his fourth issue, Dr. Chalifoux argues that the Board's final order is not supported by substantial evidence. In a substantial-evidence review, we review the agency's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 99 (Tex. App.—Austin 2004, pet. denied). We may not substitute our judgment for that of the agency on matters committed to agency discretion. Tex. Gov't Code Ann. § 2001.174 (West 2000); *Mireles v. Texas Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied). Under a substantial-evidence review, we presume that the agency's order is supported by substantial evidence, and the appellant has the burden of overcoming this presumption. *Graff Chevrolet Co., Inc. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied). The administrative procedure act (APA) gives reviewing courts the authority to "test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Id.*; *see* Tex. Gov't Code Ann. § 2001.174(2)(E). Courts must affirm administrative findings in contested cases if there is more than a scintilla of evidence to support them. *Railroad Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792-93 (Tex. 1995); *Broadhurst v. Employees Ret. Sys.*, 83 S.W.3d 320, 324 (Tex. App.—Austin 2002, pet. denied). Even if the record evidence preponderates against the agency's decision, the evidence may still be enough to satisfy a substantial-evidence review. *See Torch*, 912 S.W.2d at 793; *Graff*, 60

12

S.W.3d at 159.  However, the agency may not act arbitrarily and without regard to the facts.  *H.G. Sledge*, 36 S.W.3d at 602.

A substantial-evidence review does not require us to conclude the agency reached the correct conclusion; rather, substantial-evidence review is satisfied if "some reasonable basis exists in the record for the agency's action." *Graff*, 60 S.W.3d at 159.  An agency's actions will be upheld if "the agency's action is such that reasonable minds could have reached the conclusion the agency must have reached in order to justify its action." *Id*.  If a finding is properly supported and supports the agency's action, the court will uphold the agency's action despite the presence of irrelevant or unsupported findings in the agency's order.  *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 155 (Tex. App.—Austin 1995, writ denied).

Dr. Chalifoux challenges the Board's findings of fact as to each patient, as well as the Board's conclusions of law.  Consequently, we will address his arguments as they relate to each patient individually and then review the Board's legal conclusions.

*Patient E.F.*

The Board's final order contains thirty-seven findings of facts, Nos. 33-70, regarding E.F.  Dr. Chalifoux insists that findings of fact 37, 44, 48, 49, 53, 54, 59, 62, 63, 64, 65, 66, 67, 68, and 69 are not supported by substantial evidence.  We disagree.

In finding of fact 48, the Board found: "Once the [aneurysm] was visible, Dr. Payne recommended that Dr. Chalifoux close the patient and not proceed with the surgery."  Dr. Chalifoux claims that this finding is contrary to Dr. Payne's testimony.  Dr. Payne's testimony included the following statement:

> After attempting to clip the aneurysm and being unable to clip it, I said, Dr. Chalifoux, I don't know what you've told the family. You've explored the aneurysm. You made an attempt to clip it. It's not clipable. One option is to close up.

Dr. Payne's statement makes clear that he did recommend stopping the surgery once the aneurysm was exposed and it was clear that the aneurysm could not be clipped. Finding of fact 48 does not say that Dr. Payne ordered Dr. Chalifoux to stop the surgery or that Dr. Payne did not make any other recommendations to Dr. Chalifoux. Accordingly, Dr. Payne's testimony supports the finding. Therefore, finding of fact 48 is supported by substantial evidence. *See Graff*, 60 S.W.3d at 159.

In finding of fact 53, the Board found: "Although the intraoperative angiogram and Doppler showed evidence of cross flow of blood in E.F.'s brain, neither showed the adequacy of the cross flow of blood." Drs. Barrash and Evans both testified that the intraoperative tests Dr. Chalifoux performed did not establish the adequacy of the cross flow of blood in E.F.'s brain. Moreover, Dr. Chalifoux conceded on cross-examination that neither the angiogram nor the Doppler test demonstrated the adequacy of the cross flow of blood. Accordingly, we hold that finding of fact 53 is supported by substantial evidence. *See Broadhurst*, 83 S.W.3d at 324 (courts must affirm administrative finding if finding is supported by more than scintilla of evidence).

In finding of fact 54, the Board found: "Dr. Chalifoux did not perform a balloon temporary occlusion (BTO), an intraoperative EEG, or any other tests to determine the adequacy of cross flow of blood in E.F.'s brain with the right carotid artery clipped." On cross-examination, Dr. Chalifoux admitted that he decided to permanently clip E.F.'s right carotid artery without any knowledge as to whether there would be adequate cross flow of blood in E.F.'s brain afterwards.

In addition, Dr. Chalifoux does not contend that he performed a BTO, an intraoperative EEG, or any other test to determine the adequacy of the cross flow of blood in E.F.'s brain. Thus, finding of fact 54 is supported by substantial evidence. *See id.*

In finding of fact 59, the Board found: "E.F.'s death resulted from a severe brain infarct caused by Dr. Chalifoux occluding the right carotid artery. Adequate blood flow did not maintain in E.F.'s brain after Dr. Chalifoux occluded the carotid artery, resulting in a massive infarct, stroke, and death." Dr. Chalifoux contends that this finding is mere conjecture because the exact cause of the infarct is unknown. However, Dr. Barrash testified that, in his opinion, there was a direct relationship between the occlusion of the artery and the infarct. Dr. Barrash opined, "The blood vessel was occluded when it was not safe and caused a stroke, an infarct, which caused the patient's death." Similarly, Dr. Awad insisted E.F.'s brain infarct was caused by Dr. Chalifoux's occlusion of the carotid artery. While it is possible that E.F.'s brain infarct, stroke, and resulting death were not caused by the occlusion of the artery, it is also not unreasonable to presume that the occlusion was the underlying cause. The issue before us is not whether the finding is correct but whether there is some basis in the record to support it. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 186 (Tex. 1994); *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.). Accordingly, we conclude that the Board's finding is reasonable in light of Dr. Barrash's and Dr. Awad's testimony. Thus, substantial evidence supports finding of fact 59.

In finding of fact 62, the Board found: "Dr. Chalifoux should not have occluded E.F.'s carotid artery without first testing to determine if adequate blood flow to the right side of the

brain would remain after the occlusion." Dr. Chalifoux relies on Drs. Bailes's and Kirsch's testimony as proof that his actions did not violate any medically accepted standard of care under the circumstances. Regardless, Drs. Barrash, Evans, and Awad all agreed that whenever a surgeon decides to occlude an artery, he should perform a test occlusion to see if the patient can tolerate a permanent occlusion. Consequently, finding of fact 62 is supported by substantial evidence. *See Torch*, 912 S.W.2d at 792-93 ("Substantial evidence requires only more than a mere scintilla").

In finding of fact 63, the Board found: "No immediate life threatening condition existed for E.F. that required Dr. Chalifoux to clip E.F.'s carotid artery." Dr. Chalifoux claimed that the surgery and eventual clipping of E.F.'s carotid artery was necessary to minimize blood flow to the aneurysm and decrease the risk of a rupture. He then could use anticoagulation therapy to treat E.F.'s TIAs with less fear of a catastrophic bleed if the aneurysm were to rupture. However, Dr. Barrash testified that the worsening of the TIAs did not require emergency treatment of E.F.'s aneurysm. Moreover, Dr. Awad stated that the use of anticoagulation therapy for a short time under controlled conditions did not increase the risk of rupture. Drs. Evans and Awad both insisted that no life-threatening situation required immediate treatment of the aneurysm. Finally, Dr. Chalifoux maintained that he did not consider the aneurysm to be life-threatening as he delayed the surgery for four days after E.F. was admitted. Therefore, finding of fact 63 is supported by substantial evidence. *See Granek*, 172 S.W.3d at 778.

In finding of fact 65, the Board found: "Even after Dr. Chalifoux clipped E.F.'s carotid artery, Dr. Chalifoux knew the [aneurysm] would continue to receive some cross flow of blood, so the risk of catastrophic bleeding from a leak or rupture during anticoagulation therapy

16

would not be resolved by the procedure." Dr. Chalifoux contends that he decreased the risk of a potential rupture by clipping the carotid artery because the procedure reduced high velocity blood flow to the aneurysm. However, he does not dispute that the aneurysm continued to receive cross flow of blood after he clipped the carotid artery. Nor does he suggest that the bleeding would be any less catastrophic if the aneurysm were to rupture while E.F. was receiving anticoagulation medicine. Therefore, Dr. Chalifoux has not carried his burden of overcoming the presumption that the Board's finding of fact 65 is supported by substantial evidence. *See Graff*, 60 S.W.3d at 159.

In finding of fact 66, the Board found: "The risks of using a BTO to check E.F.'s cross flow of blood, even with E.F.'s TIAs, were less than the risk of occluding the carotid artery without testing with a BTO." Dr. Chalifoux insists that this finding is mere speculation because both options had risks. He then points out that E.F. chose not to have a BTO and that the hospital did not even have the equipment to perform a BTO. However, Dr. Chalifoux does not point to any evidence in the record discussing the relative risks associated with performing the BTO or occluding the artery without performing a BTO. He merely points to facts that have no actual relevance in a determination of whether this particular finding is supported by substantial evidence. Even if all of Dr. Chalifoux's assertions are true, they do not rebut the presumption that finding of fact 66 is supported by substantial evidence. *Id*.

In finding of fact 67, the Board found: "Dr. Chalifoux should not have performed surgery on E.F.'s [aneurysm] and should not have occluded E.F.'s carotid artery." Dr. Chalifoux argues that this finding is not supported by substantial evidence because seven physician witnesses testified that exploratory surgery was indicated under the circumstances. However, Dr. Barrash

17

testified that the aneurysm should not have been touched based on the information contained in E.F.'s chart. Similarly, Dr. Awad stated that a reasonable physician would not have recommended surgical treatment of E.F.'s aneurysm under the circumstances. He also claimed that, while it was reasonable to perform exploratory surgery on the aneurysm to determine if the carotid artery could be preserved, a BTO should have been performed if there was any intention to occlude the artery. Finally, Dr. Awad said that he would not have performed a BTO or operated on the aneurysm in this case. We acknowledge that many of Dr. Chalifoux's expert witnesses testified that the surgery on E.F.'s aneurysm was necessary. Nevertheless, a finding may survive a substantial-evidence review even when the record contains evidence that preponderates against the finding as long as some reasonable basis exists to support it. *See Torch*, 912 S.W.2d at 793; *Graff*, 60 S.W.3d at 159. Thus, in light of Dr. Barrash's and Dr. Awad's testimony, we hold that finding of fact 67 is supported by substantial evidence.

In finding of fact 68, the Board found: "Dr. Chalifoux violated the standard of care by attempting surgery on E.F.'s [aneurysm] once he saw the size, shape, location, and complexity of the [aneurysm], particularly since the [aneurysm] was asymptomatic and was not contributing to E.F.'s TIAs." Dr. Chalifoux contends that this finding is not supported by substantial evidence because the record contains evidence indicating a need for exploratory surgery. As we previously discussed, the record also contains evidence to the contrary. Accordingly, Dr. Chalifoux's contentions do not overcome the presumption that finding of fact 68 is supported by substantial evidence. *See Graff*, 60 S.W.3d at 159.

18

In finding of fact 69, the Board found: "Dr. Chalifoux violated the standard of care by clipping E.F.'s carotid artery without determining the adequacy of the cross flow of blood in the brain." Dr. Chalifoux notes that this finding ignores the fact that E.F. chose not to have a BTO. While true, this fact does not constitute evidence that Dr. Chalifoux need not have determined the adequacy of the cross flow of blood in E.F.'s brain before clipping his carotid artery. Dr. Chalifoux does not offer any other reason why the finding is not supported by substantial evidence. Consequently, he has not overcome the presumption that finding of fact 69 is supported by substantial evidence. *Id.*

Dr. Chalifoux also claims that findings of fact 37, 44, 49 and 64 are not supported by substantial evidence. Instead of addressing the evidence supporting or contradicting these findings, Dr. Chalifoux challenges their implications or the potential conclusions that could be drawn from the findings. In fact, he concedes that findings of fact 37, 44 and 49 are true. Essentially, Dr. Chalifoux construes these findings to support his position or questions their relevancy under the circumstances. Accordingly, we hold that he has not overcome the presumption that findings of fact 37, 44, 49, and 64 are supported by substantial evidence. *Id.*

*Patient C.Y.*

Dr. Chalifoux contends that finding of fact 215 is not supported by substantial evidence. Finding of fact 215 states, "Dr. Chalifoux violated the standard of care by discharging C.Y. from the hospital when she had suffered a post-surgery seizure and had other pre-seizure symptoms, and her Dilantin level was 3.9 at the time of her discharge." Dr. Barrash stated that generally a Dilantin level between 10 and 20 is considered therapeutic. The record confirms that

19

C.Y.'s Dilantin level was 3.9 at the time of her discharge. Dr. Barrash asserted that it was dangerous to discharge C.Y. with such a low Dilantin level and that her post-discharge seizure could have been predicted. He concluded that Dr. Chalifoux's post-operative treatment of C.Y. violated the standard of care. When asked about the appropriateness of discharging C.Y., Dr. Evans testified:

> I think she's discharged prematurely. I think she's still having symptoms, possibly significant symptoms, if you look at the paresthesia she's still having, blurred vision is very nonspecific. Headache is very nonspecific. That she's had seizures in the past, she had a seizure, two of them, in the hospital, I think, and her Dilantin level is too low.

Dr. Evans also concluded that Dr. Chalifoux's treatment of C.Y., as it related to her seizures, fell below the standard of care.

On rehearing, Dr. Chalifoux insists that Dr. Barrash and Dr. Evans assumed that he knew C.Y. was discharged with a sub-therapeutic Dilantin level. However, Dr. Chalifoux admitted that C.Y.'s Dilantin level was sub-therapeutic when she was discharged. He also noted that the risk of seizures increases when the Dilantin level is outside of the therapeutic range and that a patient with uncontrolled seizures may die. In addition, Dr. Eugene George, a neurosurgeon testifying on behalf of Dr. Chalifoux, asserted that C.Y.'s low Dilantin levels should have caused concern. Dr. Chalifoux further insists that C.Y.'s low Dilantin level was the result of the nurses' failure to follow his documented orders. Even if true, Dr. Chalifoux—not the nurses—discharged C.Y. with a sub-therapeutic Dilantin level. Dr. Chalifoux is responsible for confirming that his orders are properly followed. Therefore, we hold that finding of fact 215 is supported by substantial evidence. *Id.*

Dr. Chalifoux also contends that the Board's complaint, as it pertains to C.Y., lacks the specificity required to comply with the Act's notice provision. Section 164.005 of the Act states:

20

(f)  A formal complaint must allege with reasonable certainty each specific act relied on by the board to constitute a violation of a specific statute or rule. The formal complaint must be specific enough to:

    (1)  enable a person of common understanding to know what is meant by the formal complaint; and

    (2)  give the person who is the subject of the formal complaint notice of each particular act alleged to be a violation of a specific statute or rule.

Tex. Occ. Code Ann. § 164.005(f) (West 2004). Dr. Chalifoux insists that under section 164.005(f) a formal complaint must have the certainty of a criminal indictment. *See Texas State Bd. of Med. Exam'rs v. McClellan*, 307 S.W.2d 317, 320 (Tex. Civ. App.—Houston 1957, writ ref'd n.r.e.). Thus, because the Board's complaint does not contain any specific allegation of wrongdoing pertaining to the discharge of C.Y. from the hospital with a sub-therapeutic Dilantin level, Dr. Chalifoux claims that it is insufficient and cannot support finding of fact 215. We disagree.

Board proceedings are civil in nature and lack the characteristics of criminal prosecutions. *Granek*, 172 S.W.3d at 773. Consequently, the Act should not be construed to require the Board to comply with criminal standards. The complaint was sufficiently specific to inform Dr. Chalifoux as to the nature of the complaint and to provide him with notice of each statute allegedly violated. Tex. Occ. Code Ann. § 164.005(f). The relevant portions of the complaint state:

7. Due to her significant protein deficit, there were problems regulating Dilantin. A nurse practitioner was left with responsibilities of managing seizures and Dilantin regulation.

8. [C.Y.] was discharged on or about July 14, 1997. Patient C.Y. was readmitted the same day, July 14, due to seizures, aphasia, confusion and visual difficulty. Even though the nursing supervisor requested ICU admission, [Dr. Chalifoux] denied the

21

request until approximately thirty (30) minutes after the patient experienced a seizure.

* * * * *

11. [Dr. Chalifoux] failed to document that Patient C.Y. was followed daily postoperatively by himself or any neurosurgeon. The patient had problems on July 10 and no follow up observation is documented by [Dr. Chalifoux]. The nurse practitioner wrote the progress notes on or about July 11, 1997, a nurse wrote progress notes on July 12, and 13, 1997, which [Dr. Chalifoux] signed.

12. [Dr. Chalifoux] failed to provide proper post-operative care, . . ., and acted in an unprofessional manner, which constitute violation of . . . Section 164.051(a)(1), Medical Practice Act; . . . Section 164.051(a)(6); . . . Section 164.052(a)(5); . . . Section164.053(a)(5); . . . Section 164.053(a)(6); . . . Section 164.053(a)(8); . . . Section 164.001; and . . . Section 165.001.

These allegations indicate that (1) there had been difficulties associated with regulating C.Y.'s Dilantin levels, (2) C.Y.'s seizures were related to her Dilantin levels, and (3) C.Y. had a seizure immediately after she was discharged. The complaint's reference to the provision of "proper post-operative care" must include Dr. Chalifoux's decision to discharge C.Y. from the hospital. Moreover, it is hard to imagine that the Board's allegation did not sufficiently apprise Dr. Chalifoux that his decision to discharge C.Y. could be scrutinized given the fact that C.Y. had a seizure only hours after she was initially discharged. Accordingly, we hold that the Board's allegations comply with the Act's notice provision. *Id*.

*Patient A.J.*

Dr. Chalifoux also claims that the Board's complaint is insufficient and does not support finding of fact 226. Finding of fact 226 states, "On June 13, Dr. Chalifoux violated standard of care in assessing [the] possibility of [a] CSF leak because he had A.J. lie down, a position that

minimized possibility of a hydrostatically induced headache or drainage, the classic symptoms of a CSF leak." Dr. Chalifoux initially discharged A.J. from the hospital on June 13. A.J. was readmitted to the hospital on June 14 complaining of right leg pain, a headache, and drainage from her wound. Dr. Chalifoux contends that finding of fact 226 is not supported by the complaint because the finding relates to acts that took place prior to A.J.'s initial discharge from the hospital, while the complaint only alleges violations that took place after A.J. was readmitted to the hospital. He also insists that the complaint does not allege that Dr. Chalifoux wrongly discharged A.J.

We agree with Dr. Chalifoux that finding of fact 226 relates to his decision to discharge A.J. on June 13 and whether the postoperative tests he performed were adequate to determine whether the drainage from A.J.'s wound was CSF. However, we disagree with Dr. Chalifoux's assertions that the complaint does not sufficiently address his treatment of A.J. before the June 13 discharge nor his decision to actually discharge A.J. In count twelve of the complaint, the Board alleged that "Respondent [Dr. Chalifoux] failed to provide adequate postoperative management evidenced by the complications in the continued leakage of CSF." The allegation clearly refers to all of Dr. Chalifoux's postoperative treatment of A.J.; it is not limited to Dr. Chalifoux's actions after he actually determined that A.J. had a CSF leak upon readmission to the hospital. As we stated previously, the decision to discharge a patient is clearly related to the provision of postoperative care. In addition, Dr. Chalifoux's decision to discharge A.J. was partially based on his incorrect conclusion that the drainage from A.J.'s wound was not CSF. Finding of fact 226 criticizes the adequacy of the techniques Dr. Chalifoux used to determine whether the drainage from A.J.'s wound was CSF before discharging her from the hospital on June 13. Finally, we

23

acknowledge that the complaint incorrectly states, "Respondent was discharged on or about June 13, 1998, and readmitted on June 15, 1998, with obvious drainage of spinal fluid from the wound." There is no indication that this typographical error led Dr. Chalifoux to believe that he, rather than A.J., was discharged from the hospital on June 13. In fact, Dr. Chalifoux's attorney did not even notice the error until he was examining Dr. Chalifoux at the November 5, 2002 administrative hearing. Consequently, we conclude that the complaint's allegations support the finding and were sufficient to notify Dr. Chalifoux that his postoperative care of A.J., in particular his actions in diagnosing and treating A.J.'s postoperative CSF leak, would be at issue at his hearing. *Id*.

Dr. Chalifoux also argues that finding of fact 226 is not supported by substantial evidence. Dr. Barrash testified that Dr. Chalifoux should have known prior to discharging A.J. on June 13 that she had a CSF leak because the fluid he aspirated from her wound just hours before discharge was obviously CSF. Dr. Barrash stated that it was imprudent to discharge a patient with a CSF leak and concluded that Dr. Chalifoux demonstrated a complete lack of knowledge regarding the proper treatment of CSF leaks. Dr. Evans agreed that Dr. Chalifoux should have realized that the drainage from A.J.'s wound was CSF. He also testified that CSF leaks are affected by hydrostatic pressure caused by a patient's position. Dr. Chalifoux does not dispute that a patient's position, such as lying down, can decrease the symptoms of a CSF leak. He merely insists that his decision to discharge A.J. was not based solely on his observation of her after she was lying down for two hours. This assertion is insufficient to overcome the presumption that the Board's finding is supported by substantial evidence. *Graff*, 60 S.W.3d at 159.

24

*Conclusions of law*

Dr. Chalifoux claims that the Board's conclusion of law that he "violated an accepted medical standard of care in his treatment of patients E.F., C.Y., and A.J.," does not support its subsequent conclusion that he violated sections 164.051(a)(6) and 164.052(a)(5) of the Act. *See* Tex. Occ. Code Ann. §§ 164.051(a)(6), .052(a)(5) (West 2004 & West Supp. 2006). Dr. Chalifoux suggests that the Board has misinterpreted sections 164.051(a)(6) and 164.052(a)(5) because the legislature intended for the sections to address grossly immoral, dishonorable, or disreputable acts in connection with the practice of medicine. Specifically, he insists that a violation of these sections requires "more than the mere deviation or violation of an accepted medical standard." He claims that these sections were designed to address a complete "disregard of the public health and welfare" or grossly negligent conduct. We disagree.

Dr. Chalifoux cites to the Medical Liability and Insurance Improvement Act, *see generally* Act of May 30, 1977, 65th Leg., R.S., ch. 817, Part 1, 1977 Tex. Gen. Laws 2039, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884, and to the Final Report of the Texas Medical Professional Liability Study Commission to the 65th Texas Legislature (December 1976), and argues that they demonstrate that the legislature intended to require more than mere proof of a violation of a standard of care to justify discipline under the Act.[5] Dr. Chalifoux notes that Subcommittee II of the Keeton Commission recommended:

---

[5] In 1975, the 64th Legislature created the Medical Professional Liability Study Commission, known as "the Keeton Commission" in reference to its chairman, W. Page Keeton. *See Schepps v. Presbyterian Hosp. of Dallas*, 652 S.W.2d 934, 936-37 (Tex. 1983). The Commission studied the causes of the medical malpractice crisis alleged to exist at the time. It made recommendations to the 65th Legislature in a report entitled "Final Report of the Texas Medical Professional Liability Study Commission to the 65th Texas Legislature." In enacting the Medical Liability and Insurance Improvement Act in 1977, the legislature explicitly adopted the findings of the commission. *Id*. at 937 n.4.

That an amendment be made to the Medical Practice Act under the terms and conditions that would insure adequate constitutional guarantees for suspension or revocation of a physician's license for gross professional misconduct, or incompetency to practice medicine in an acceptable manner consistent with public safety.

However, the Keeton Commission's final report did not include the subcommittee's recommendation. The Keeton Commission recommended, "[T]he Texas Medical Practice Act be broadened to allow the Texas State Board of Medical Examiners to discipline physicians for failure or inability to practice medicine in an acceptable manner consistent with the public health and safety." The subcommittee's recommendation was not adopted and does not countermand the specific recommendations included in the Keeton Commission's final report.

Dr. Chalifoux also cites to the legislative history of House Bill 1048 in 1977 as proof that the legislature did not intend to impose discipline for a mere deviation from the standard of care. Originally, the bill provided for the discipline of a physician who had been found to have failed to "practice medicine within the standard of care of a reasonable prudent physician." Tex. H.B. 1048 65th Leg., R.S. (1977) (committee report). However, the bill as enacted did not include this "standard of care" language. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 2.11, 1977 Tex. Gen. Laws, 2039, 2045. Instead, discipline was conditioned on a finding that the physician failed "to practice medicine in an acceptable manner consistent with public health and welfare." *See id*. Dr. Chalifoux insists that the deletion of the standard of care language discloses the legislature's intent to reject the proposal authorizing the Board to discipline a physician for violating the generally accepted standard of care. *See Transportation Ins. Co. v. Maksyn*, 580 S.W.2d 334, 338 (Tex. 1979). We note, that the bill does not specifically preclude disciplining a physician for a violation of the standard of care. Rather than rejecting violations of the standard of care as a ground for disciplining physicians, the legislature may have deleted the language because it unnecessarily limited the

26

Board's authority. Dr. Chalifoux does not account for this possibility. Accordingly, we cannot conclude as a matter of law that the legislature did not intend to allow the Board to discipline a physician for a violation of the standard of care.

Under section 164.051(a)(6) the Board may discipline a physician who "fails to practice medicine in an acceptable professional manner consistent with public health and welfare." Tex. Occ. Code Ann. § 164.051(a)(6). The legislature did not define or explain what would constitute a violation of this statute. Accordingly, the Board adopted a rule providing that the failure to practice medicine in an acceptable professional manner consistent with public health and welfare includes, but is not limited to, such acts as: (1) failure to treat a patient according to the generally accepted standard of care; (2) negligence in performing medical services; (3) failure to use proper diligence in one's professional practice; and (4) failure to safeguard against potential complications. *See* 22 Tex. Admin. Code § 190.8(1)(A)-(D) (2006).[6] This list indicates that a physician's conduct could be inconsistent with public health and welfare whether or not it resulted in actual harm to the public or stemmed from fraudulent acts.

---

[6] We recognize that this rule, *see* 22 Tex. Admin. Code § 190.8(1)(A)-(D) (2006), was not in effect when the alleged violations occurred. However, the rule reflects the Board's interpretation of sections 164.051(a)(6) and 164.052(a)(5) of the Act. *See* Tex. Occ. Code Ann. §§ 164.051(a)(6), .052(a)(5) (West 2004 & West Supp. 2006). Generally, if the construction given to a statute by the agency charged with its enforcement is reasonable and does not contradict the plain language of the statute, then it is entitled to serious consideration. *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 807 (Tex. 2002); *see also Barchus v. State Farm Fire & Cas. Co.*, 167 S.W.3d 575, 578 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Dr. Chalifoux does not contend that the Board acted outside of its authority to interpret the Act and adopt rules to perform its duties, regulate the practice of medicine, and enforce the Act. Tex. Occ. Code Ann. § 153.001 (West 2004). Although the Board's interpretations and legal determinations are not binding on this Court, we rely on the Board's rules as persuasive authority with regard to the scope of sections 164.051(a)(6) and 164.052(a)(5) of the Act. *See Barchus*, 167 S.W.3d at 578.

27

The Board is also statutorily permitted to discipline a physician who commits a prohibited act. Tex. Occ. Code Ann. § 164.051(a)(1). In section 164.052, the legislature provided a list of prohibited practices, one of which is "unprofessional or dishonorable conduct that is *likely* to deceive or defraud the public, as provided by section 164.053, or injure the public." *Id*. § 164.052(a)(5) (emphasis added). The use of the word "likely" indicates that a finding of actual harm is unnecessary. In section 164.053 the legislature provided a non-exhaustive list of acts that it considered to be unprofessional or dishonorable and in violation of section 164.052(a)(5). The list includes conduct in which a physician "fails to supervise adequately the activities of those acting under the supervision of the physician" or "delegates professional medical responsibility or acts to a person if the delegating physician knows or has reason to know that the person is not qualified . . . to perform the responsibility or acts." *Id*. § 164.053(a)(8), (a)(9). In addition, the Board has determined that "[u]nprofessional and dishonorable conduct that is likely to deceive, defraud, or injure the public within the meaning of the Act" includes, but is not limited to: violating a Board order; providing false information to the Board; failing to cooperate with Board staff; and failing to complete the required amounts of continuing medical education. *See* 22 Tex. Admin. Code §§ 190.8(2)(A), (2)(C), (2)(D), (2)(M). The legislature's and the Board's examples of the types of acts that are considered to be unprofessional or dishonorable, combined with the legislature's use of the phrase *likely to deceive or defraud the public*, demonstrate that section 164.052(a)(5) was not intended to prohibit only extremely egregious or grossly negligent conduct.

The legislature could have required a finding of actual injury or grossly negligent conduct before permitting the Board to discipline a physician under sections 164.051(a)(6) and

28

164.052(a)(5) of the Act. Or it could have delineated a tort standard for determining when discipline is appropriate. It did neither. Instead, the legislature expressly provided the Board with the authority to take disciplinary action against a physician who either commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public or fails to practice medicine in an acceptable professional manner consistent with public health and welfare. Tex. Occ. Code Ann. §§ 164.051(a)(1), (a)(6), .052(a)(5). We conclude that construing these sections to require egregious or grossly negligent conduct would unnecessarily limit the scope of the statutes. We overrule Dr. Chalifoux's fourth issue.

**Peer-review evidence**

In his first issue, Dr. Chalifoux contends that the Board violated his due process rights by (1) exposing itself to and considering evidence that was irrelevant, immaterial, and excluded; and (2) violating express provisions of the APA by interlocutorily appealing the ALJ's evidentiary ruling.

In its complaint, the Board alleged that, because Dr. Chalifoux had been disciplined by four different hospitals, he was subject to disciplinary action pursuant to section 164.051(a)(7) of the Act. *See id*. § 164.051(a)(7) (Board may take disciplinary action against person if person is disciplined by a licensed hospital). Accordingly, the Board notified Dr. Chalifoux of its intent to offer into evidence peer-review records pertaining to any disciplinary action taken by the hospitals. Dr. Chalifoux objected and on October 18, 2002, the ALJ held a pre-trial hearing to determine the admissibility of the peer-review records. Dr. Chalifoux argued that peer-review records are confidential and privileged and not admissible at an administrative hearing unless a waiver has been obtained from the peer-review committee. The Board claimed that the Act authorizes the disclosure

29

of peer-review records at disciplinary hearings brought by the Board. The ALJ agreed with Dr. Chalifoux and refused to admit the peer-review records.[7]

The Board's staff prosecuting the case interlocutorily appealed the ALJ's order to the Board. The Board concluded that the exclusion of the peer-review documents was improper, reversed the ALJ's order, and ordered that the evidentiary record be re-opened to consider testimony relating to the peer-review matters. Despite the Board's order, the ALJs refused to revisit the original evidentiary ruling and did not consider the peer-review documents when drafting the proposal for decision.

Even if the Board violated the APA by interlocutorily appealing the ALJ's evidentiary ruling and ordering the subsequent ALJs to consider the previously excluded evidence, Dr. Chalifoux's due process rights were not violated, and he was not harmed because there is no indication in the record that either the ALJs or the Board considered the excluded evidence in reaching their final conclusions. *See* Tex. R. App. P. 44.1 (judgment may not be reversed on appeal unless it is shown that error probably caused rendition of improper judgment or prevented appellant from properly presenting case on appeal). The only mention of the peer reviews in the ALJs' proposal for decision is found in finding of fact 307(f) which states, "Peer reviews were conducted on the cases involved in this proceeding but there were no prior peer reviews involving similar misconduct." There is nothing in this finding that suggests that the ALJs reviewed the peer-review

---

[7] On rehearing, Dr. Chalifoux claims that the Board's staff improperly made an offer of proof so that the excluded peer-review documents could become part of the administrative record. In order to appeal the ALJ's order excluding the peer-review documents, the Board's staff was required to make an offer of proof. *See* 1 Tex. Admin. Code § 155.51(d)(4) (2006) (stating that exhibit excluded from evidence will be considered withdrawn unless party makes offer of proof).

materials; the finding simply acknowledges the fact that peer reviews were conducted. Moreover, the ALJs presented this finding and relied on the fact that there were no other similar peer reviews as a mitigating factor to support their recommendation that Dr. Chalifoux receive a probated suspension of his license.

The Board's final order adopts the ALJs' proposal for decision except for conclusions of law 12 and 13, which contained the ALJs' punishment recommendations that Dr. Chalifoux's license be suspended for five years and that no administrative penalty be imposed. The final order contains the Board's reason and legal basis for eliminating these proposed conclusions of law. The Board initially stated that it is charged with the duty to make the final decision in disciplinary matters, including the assessment of sanctions. *See* Tex. Occ. Code Ann. § 151.003(2) (West 2004). The Board also relied on its own rule outlining its role in the disciplinary process, which provides, "The board welcomes recommendations of administrative law judges as to the sanctions to be imposed, but the board is not bound by such recommendations." 22 Tex. Admin. Code § 190.2. The Board then explained, "In this case [the] Board finds that the death of E.F. and the findings regarding patient C.Y. and A.J. constitute such a deviation from the standard of care that revocation of [Dr. Chalifoux's] license is the only sanction that will adequately protect the public." The Board also explained that, because an administrative penalty was not sought in this case, conclusion of law 13 had "no effect and is unnecessary . . . and is therefore deleted." There is nothing in the Board's explanation suggesting that it reviewed or considered the peer-review materials in reaching its final decision regarding the revocation of Dr. Chalifoux's license.

The Board's final order closes with a statement regarding the admissibility of the peer-review evidence. In the statement, the Board asserts that peer-review materials were improperly

excluded and that the relevant sections of the Act were misapplied and misinterpreted. The Board then states:

> This misapplication of the peer review statute is further compounded by the ALJs finding that peer review was a mitigating factor . . . in the [proposal for decision]. There was absolutely no evidence introduced by [Dr. Chalifoux] at trial regarding peer review or mitigation, and board staff was precluded from introducing any evidence regarding peer review at all. The misapplication resulted in the exclusion of evidence that would have demonstrated the egregious nature of [Dr. Chalifoux's] conduct. Further, if the peer review material had been allowed into evidence, as required by statute, it would have been considered an aggravating factor that would appear to support imposition of a severe sanction.

Dr. Chalifoux points to this portion of the statement as proof that the Board improperly considered the peer-review materials. The statement only opines as to the effect the evidence would have had *if* it had been admitted at Dr. Chalifoux's hearing. While the statement is some evidence that the Board did review the peer-review evidence, it does not establish that any of the Board's conclusions, in particular its decision to revoke Dr. Chalifoux's license, were affected by this evidence. Even if the Board did review the excluded evidence, there is no proof in the record that the Board relied on it. The Board's final order specifically states that the revocation of Dr. Chalifoux's license is "reasonably supported by evidence adduced at trial and found in the record, in particular findings related to the death of patient E.F." We have no reason to presume otherwise. Because there is no evidence that Dr. Chalifoux was harmed by the peer-review evidence, we overrule his first issue. *See* Tex. R. App. P. 44.1.

32

**Due process**

In his second issue, Dr. Chalifoux claims that the Board adopted the final order in violation of his due process rights. At the Board's June 2004 open meeting, the ALJs presented their proposal for decision and recommended a probated suspension of Dr. Chalifoux's license. The Board's staff then distributed a copy of a proposed order that adopted all of the ALJs' findings of fact and conclusions of law except for their penalty recommendations. The Board's staff recommended that Dr. Chalifoux's license be revoked. After considering the two proposals, the Board adopted its staff's proposed order and revoked Dr. Chalifoux's license. Two of the Board members who participated at the June 2004 meeting, Dr. Thomas Kirksey and Dr. Jose Benavides, also served on the disciplinary panel that temporarily suspended Dr. Chalifoux's license in 2002. Dr. Chalifoux contends that the participation of these two doctors at the June 2004 meeting was improper and unfair because, as participants in the prior proceeding involving Dr. Chalifoux, they were exposed to evidence that was not before the Board and not made part of the administrative record. Dr. Chalifoux suggests that the two doctors were improperly influenced and that they should have recused themselves from the June 2004 meeting.

Due process requires that parties be accorded a full and fair hearing on disputed fact issues. *See Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 731 (Tex. App.—Austin 2004, pet. denied). We presume that decision makers are unbiased. *Id.* In order to overcome this presumption, Dr. Chalifoux must establish that the doctors' participation on the temporary suspension panel caused their minds to be irrevocably closed to the matters at issue in the Board's final order, thus rendering them incapable of judging Dr. Chalifoux's case based on the evidence and testimony presented during his administrative hearing. *See id.*

33

The record does not indicate what role the doctors played on the temporary suspension panel. Nor does it establish that they unduly influenced the Board's final decision. The record only shows that Dr. Kirksey and Dr. Benavides were present at the June 2004 open meeting. Dr. Chalifoux's bare assertion that their mere participation at the meeting was improper and violated his due process rights is insufficient to overcome the presumption that both Dr. Kirksey and Dr. Benavides conducted themselves in a fair and unbiased manner. *See id*. In addition, the doctors did not violate the Act or any of the Board's rules by serving on the temporary suspension panel and later participating in the final determination of the Board's complaint against Dr. Chalifoux. Finally, Dr. Chalifoux did not request that either of the doctors recuse themselves as permitted by the Board's rules. *See* Tex. Admin. Code § 187.42(c) (2006).

Dr. Chalifoux also argues that the Board's staff engaged in *ex parte* communications because it was obvious that the Board received a copy of its staff's proposed order prior to the June 2004 open meeting. There is no indication in either the minutes of the June 2004 meeting or the administrative record that any *ex parte* communication took place. Without more than Dr. Chalifoux's unsubstantiated claim, we cannot conclude that the Board's staff engaged in any improper *ex parte* communications or that any improper communication harmed Dr. Chalifoux. Accordingly, we overrule Dr. Chalifoux's second issue.

**Arbitrary and capricious**

In issue three, Dr. Chalifoux insists that the Board's final order was based upon arbitrary and capricious actions. We must reverse or remand a case "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious or characterized by abuse of discretion or clearly

34

unwarranted exercise of discretion." Tex. Gov't Code Ann. § 2001.174(2)(F). An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *City of El Paso*, 883 S.W.2d at 184. A court reviewing a decision for arbitrariness should consider all relevant factors and may not substitute its judgment as to the weight of the evidence for that of the agency. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 211 (Tex. 1991). Dr. Chalifoux notes that the Board's final order demonstrates that it considered mitigating evidence that would support a lesser sanction. Despite acknowledging the existence of mitigating evidence, Dr. Chalifoux argues that the Board unreasonably revoked his license based on its consideration of an irrelevant factor, the peer-review evidence. We disagree.

As we previously discussed, there is no evidence that the Board considered the peer-review evidence in reaching its final decision. Furthermore, the Board's conclusions are explicitly based on its findings and the evidence presented at the hearing. Other than the statement at the conclusion of the Board's final order—that the evidence was improperly excluded—there is no mention in the final order pertaining to the contents of the peer-review evidence. We agree with Dr. Chalifoux that the Board's findings include mitigating evidence that could support a lesser sanction; however, the findings also point to evidence that supports the Board's decision to revoke Dr. Chalifoux's license. On rehearing, Dr. Chalifoux suggests that because finding of fact 307 contains mitigating evidence—specifically a statement that Dr. Chalifoux has "rehabilitative potential"—it was unreasonable for the Board to revoke his license. The mere presence of mitigating evidence does not, by itself, preclude the Board from concluding that Dr. Chalifoux failed to practice medicine

35

in an acceptable professional manner consistent with public health and welfare, *see* Tex. Occ. Code Ann. § 164.051(a)(6), or that he committed unprofessional or dishonorable conduct that was likely to deceive or defraud the public, *see* Tex. Occ. Code. Ann. § 164.052(a)(5). Ultimately, the Board is authorized to review the evidence and make the final decision in disciplinary matters; we may not substitute our judgment for that of the Board. *See* Tex. Occ. Code Ann. § 164.001 (West Supp. 2005); *Gulf States*, 809 S.W.2d at 211. We hold that the Board's final order is neither arbitrary nor capricious and overrule Dr. Chalifoux's third issue.

### Conclusion

We affirm the district court's final judgment affirming the Board's final order.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: November 1, 2006